**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-50096

United States of America,

Plaintiff-Appellee,

VERSUS

Ruben Horacio Gallardo-Trapero, David Christopher Hernandez,
and Luis Quintero De Avila,

Defendants-Appellants.

Appeals from the United States District Court
For the Western District of Texas

August 11, 1999

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This direct criminal appeal arises from the conviction following jury trial of Appellants Ruben Gallardo, David Hernandez, and Luis Quintero for conspiracy to distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1). For the reasons assigned, we affirm the convictions and sentences of the Appellants.

I.  FACTS

The government's evidence in this case demonstrated the

1

existence of a drug organization funneling marijuana from California and Texas to several Midwestern cities. The complicated facts of this appeal involve numerous drug distributors and couriers. The government indicted ten co-conspirators as being part of a single drug conspiracy. Appellants Ruben Horacio Gallardo-Trapero (Gallardo), David Christopher Hernandez (Hernandez), and Luis Quintero de Avila (Quintero) were tried together and convicted for various roles in the drug conspiracy. Since detailed facts will be recounted in subsequent sections dealing with Appellants' specific claims, we will only sketch a general overview of the drug conspiracy here.

The government's case relied upon the testimony of the drug couriers involved in this conspiracy: John Langhout (Langhout) and Fred and Lucy Miller (the Millers). Langhout and the Millers were apparently selected because they do not fit any standard drug courier profiles: Langhout was in his mid-50s when he made these drug runs while Fred Miller was in his early 70s and Lucy Miller was in her mid-50s. Langhout and the Millers each made numerous trips delivering marijuana from southern California and Texas to Midwestern cities. They were originally drawn into this operation by an individual named Octavio Rivera (Rivera). John Langhout made his first drug run for Rivera on March 23, 1994, and took a car loaded with marijuana from Chula Vista, California, to Chicago and then Detroit. The Millers also made their first trip for Rivera (whom they knew by the name Mario) in late March 1994 from Chula Vista--which is south of San Diego--to Chicago and Detroit as well.

For driving the loads of marijuana across the county, the couriers were usually paid $10,000.

Langhout and the Millers each made numerous deliveries. The first runs for both Langhout and the Millers originated in southern California. Later, Langhout and the Millers both made deliveries that began in Texas. On some occasions, Octavio Rivera would meet them in the drop-off city. On many other occasions, Langhout and the Millers delivered the marijuana to specified individuals in each of these cities. On all of the drug runs, the couriers communicated with Rivera and his associates by cellular phones and beepers. The Millers and Langhout would be instructed where to deliver the marijuana en route as they neared their Midwest destinations.

The Millers made ten drug runs in all, usually about once a month. They testified that they had delivered marijuana to David Hernandez in Detroit and had made other deliveries to Chicago, Indianapolis, and Piketon, Ohio. The Millers testified that on one trip to Chicago they contacted Octavio Rivera, apparently after losing their way, and that Rivera, Hernandez, and Quintero came to meet them in a pickup truck and led them to the place of delivery. In addition, Lucy Miller testified that after Octavio Rivera told them by phone that someone would come to their El Paso hotel with instructions as to a shipment, Gallardo was the person who came to their room. In May 1995, after the Millers were stopped for speeding in Missouri, the police discovered a marijuana shipment in their vehicle. Upon arrest, they agreed to cooperate with

3

authorities in making a police-monitored delivery in Ohio.  They pleaded guilty in federal court in Ohio and received a prison sentence of a year and one day.

John Langhout made approximately thirteen drug deliveries between March 1994 and February 1996.  He testified that he made several drug deliveries to David Hernandez in Detroit and to other contacts in Indianapolis, Chicago, and Michigan City, Indiana.  Langhout testified that on one trip he and Octavio Rivera traveled to Indianapolis and picked up marijuana from a previous delivery that was being returned because of poor quality by the contact there, Sergio Zamora (Zamora), and that he (Langhout) and Rivera took this load to Chicago and delivered it to Felipe Gomez (Gomez).[1]  Langhout's early trips originated in southern California, but he later picked up shipments in El Paso and Laredo, Texas.  In late January 1995, Langhout went to El Paso at the request of Octavio Rivera, where he met Rivera, Felipe Gomez, and Ricardo Avila (Avila) in picking up a drug shipment.  Langhout testified that he subsequently made other shipments of drugs for Rivera that Avila orchestrated.

Langhout testified that at some point Ricardo Avila "stole" him for a run out of El Paso.  Langhout said that Avila, and not Rivera, was his boss for that shipment which he took to Chicago.  Although Langhout testified that he considered this to be a separate operation, he also claimed that Octavio Rivera and Ricardo

---

[1]Gomez and Zamora were indicted in this conspiracy but both pleaded guilty before trial and testified for the government in the present case.

Avila were "associates" and that as a driver he was kept in the dark about specific information regarding their relationship within the illicit drug activities. Langhout was arrested on a drug run in Del Rio, Texas, on October 4, 1995, along with Ricardo Avila. Langhout agreed to cooperate with the government and, pursuant thereto, acceded to Gomez's request to undertake a shipment from south Texas. The preliminary activity involving this shipment in McAllen, Texas, led to the arrests of Gomez, Gallardo, and Quintero.

Langhout testified that he met Gomez and Quintero in McAllen about the drug run. Langhout testified that he was being "stolen" again--this time, by Gomez and Quintero from Avila. Gomez also testified that he was acting under the orders of Roberto and Javier Lopez. After the marijuana shipment failed to arrive in McAllen within a few days, Langhout returned to El Paso. When the marijuana load eventually arrived, Langhout alerted the Drug Enforcement Administration (DEA) agents and returned to McAllen in a Lincoln Towncar, ostensibly to pick up the cargo. On February 15, 1996, Langhout gave Gomez possession of the Lincoln Towncar for the purpose of loading it with marijuana. Under DEA surveillance, Gomez followed Quintero to a location near the house where the marijuana was located. Quintero parked the Toyota Camry he was driving, got into the Lincoln Towncar, and went with Gomez to Gallardo's house at 2100 North Eighth Street. Gomez backed the car into the garage. After approximately twenty minutes, Gomez drove away in the Lincoln Towncar and Quintero and Gallardo departed in

5

the Toyota Camry.  Gomez was arrested when he reached Langhout's hotel; the Lincoln Towncar's trunk contained 454 pounds of marijuana.  Quintero and Gallardo were arrested shortly afterwards.  No drugs were found in the Camry, but Quintero possessed a drug ledger and Gallardo had several small pieces of paper bearing names and phone numbers.  Gallardo was informed of his Miranda rights but he talked with the DEA Agents and consented to a search of his house.  There, the agents found 43 bundles of marijuana weighing 638 pounds.

On April 10, 1996, Appellant Hernandez was arrested in Detroit.  In the spring of 1996, an arrest warrant for Hernandez had been issued in the Western District of Texas in connection with this conspiracy.  Previously, in August 1995, Hernandez had been stopped in the Detroit airport (after using cash to purchase a one-way ticket to Orange County, California) and was found to be carrying approximately $49,000 in cash on his person.  Hernandez had placed the bundles of cash around his lower back and these were kept in place by his tucked-in shirt.

Gallardo, Hernandez, and Quintero were tried together.  Gomez pleaded guilty and testified against them at trial.  The Millers both served time after they pleaded guilty in federal court in Ohio.  Langhout was never prosecuted for his participation.  Likewise, Avila was never prosecuted following his arrest.  Insofar as the record discloses, neither Octavio Rivera, Roberto Lopez, or Javier Lopez was ever apprehended or charged in connection with this conspiracy.

6

## II.  CONSPIRACY

Appellants Hernandez and Quintero contend that a material variance existed between their indictment for a single conspiracy, and the evidence adduced at trial which, they contend, pointed to the existence of multiple conspiracies.  They contend that there was insufficient evidence tying together all the individuals and drug transactions brought forward at trial.  Fatal variance claims spring from protections in the Fifth and Sixth Amendments and are the right "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others."  Kotteakos v. United States, 328 U.S. 750, 775 (1946).

Appellants Hernandez and Quintero fashioned this fatal variance claim as an appeal of the trial court's denial of their motions for a judgment of acquittal.  They assert that the district court erred in not granting their motion for a judgment of acquittal because the evidence precluded a finding that a single conspiracy existed.  Their motion for a judgment of acquittal is treated as a challenge to the sufficiency of the evidence to convict.  United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998), cert. denied, 119 S. Ct. 1344 (1999).

This court reviews a claim of insufficient evidence to determine whether a rational trier of fact could have found that the evidence proved the essential elements of the crime beyond a reasonable doubt.  United States v. Ramirez, 145 F.3d 345, 350 (5th Cir. 1998).  The evidence presented at trial is viewed in the light most favorable to the government and with all reasonable inferences

7

made in support of the jury's verdict.  United States v. Thomas, 120 F.3d 564, 569 (5th Cir. 1997), cert. denied, 118 S. Ct. 721 (1998).

We review in two steps the Appellants' claim of a fatal variance between the single conspiracy charged in the indictment and the trial evidence, which they contend relates to multiple conspiracies.  First, we must decide whether the evidence varied from the indictment's allegations and whether it supports a reasonable finding of one conspiracy linking all defendants with all transactions.  Second, if there was such a variance, we must assess whether that variance affected a substantial right of the appellants.  United States v. Medina, 161 F.3d at 872.

The Appellants claim that the record demonstrates the existence of at least two distinct conspiracies:  one organized by Octavio Rivera involving narcotics shipments from southern California and El Paso and Laredo, Texas, to several Midwestern cities, and a second one in which marijuana was to be shipped from McAllen, Texas.  Quintero suggests that there were actually three conspiracies:  one headed up by Octavio Rivera, one organized by Ricardo Avila, and a third one centered in McAllen, headed by Javier and Roberto Lopez and run by Felipe Gomez.

We conclude that there was no material variance between the indictment and the evidence presented at trial.  As the defendants recognize, the evidence does not demonstrate with absolute certainty whether the individuals who coordinated the marijuana shipments were all associates in one organization or whether any of

8

these individuals had, on occasion, struck out on his own as the head of a separate conspiracy. There is, however, a high degree of overlap of individuals involved in the drug operations described by the evidence. The use of the same drug couriers, John Langhout and Fred and Lucy Miller, is some evidence of a common criminal enterprise. Langhout made numerous runs for Octavio Rivera from both California and Texas and delivered the marijuana shipments to individuals such as David Hernandez (and sometimes Rivera himself) in various Midwestern locales. Langhout also picked up a shipment from Ricardo Avila in El Paso which was delivered to Chicago. In addition, Langhout was recruited by Felipe Gomez and Luis Quintero to be the driver of the shipment from McAllen which was terminated by the arrests of several defendants and the seizures of marijuana and Langhout's Lincoln Towncar.

Felipe Gomez is another individual who reappears throughout the record. Gomez was the recipient of a shipment of marijuana in Chicago from Langhout and Octavio Rivera on one of Langhout's early trips. At another time, Gomez picked up Hernandez at the El Paso airport on Octavio Rivera's orders and met Langhout in order to transfer marijuana into Langhout's car for the drive to Chicago. Langhout testified that on one occasion he met with Gomez, Octavio Rivera, and Ricardo Avila in El Paso during his pickup of approximately 200 pounds of marijuana for a delivery to Chicago for Rivera. Langhout testified that on another occasion Gomez and Rivera gave him $60,000 in Chicago to bring back to a contact in Laredo, Texas. Finally, Gomez was involved with Quintero in

9

organizing a shipment from McAllen, Texas, to Chicago where Langhout was instructed to transport the cargo and to meet Gomez. As we stated earlier, this plan was terminated when Gomez was arrested in Langhout's rented Lincoln Towncar with 450 pounds of marijuana in McAllen.

The ties between individuals involved in the alleged conspiracy do not end there. Testimony linked Octavio Rivera with (1) deliveries to Hernandez in Detroit, (2) shipments in collaboration with Felipe Gomez from El Paso, and (3) shipments organized in association with Gomez and Ricardo Avila from El Paso. Langhout testified that he met with Ricardo Avila and Appellant Quintero in El Paso in order to accept payment from Avila for an earlier drug run; that he met with Felipe Gomez and Luis Quintero in McAllen because they were expecting to receive marijuana; and that on this occasion Quintero said that he wanted Langhout to work for him instead of for Ricardo Avila in the future.

In reviewing Appellants' claim of material variance, the primary factors to be considered in determining whether a single conspiracy was proven are (1) the existence of a common goal, (2) the nature of the scheme, and (3) the overlapping of participants in the various dealings. United States v. Morgan, 117 F.3d 849, 858 (5th Cir. 1997); United States v. Pena-Rodriguez, 110 F.3d 1120, 1126 (5th Cir.), cert. denied, 118 S. Ct. 71, 72 (1997). Whether the evidence proved the existence of single or multiple conspiracies is a question of fact for the jury. We must affirm the jury's finding that the government proved a single conspiracy

10

"unless the evidence, viewed in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." Morgan, 117 F.3d at 858.

Viewing the evidence in the light most favorable to the government, we are convinced that the evidence presented here would allow a reasonable juror to find beyond a reasonable doubt that a single conspiracy existed involving all of the Appellants. There was a common goal of transporting marijuana to certain Midwestern cities and the scheme hinged upon the participants' supplying the couriers with the drugs and then contacting the couriers along their route to direct them to their drop off cargo in Detroit, Chicago, Indianapolis, or Michigan City. As demonstrated above, there was significant overlap in the participants in the various dealings. It may be true that certain participants did not know others involved in the different operations, but "to establish an overlap, '[t]he government does not have to establish that the sellers and purchasers knew each other or knew what each was doing.'" United States v. Payne, 99 F.3d 1273, 1280 (5th Cir. 1996) (quoting United States v. Morris, 46 F.3d 410, 416 (5th Cir. 1995)). In addition, the jury instruction given by the district court was designed to safeguard the Appellants against the possibility of guilt transference.[2] See Pena-Rodriquez, 110 F.3d

---

[2]The district court instructed the jury as follows:
Of course, mere presence at the scene of an alleged transaction or event, even with knowledge that a crime is being committed, or mere similarity of conduct among various persons, and the fact that they may have associated with each other, does not establish the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who

at 1128-29 (similar jury instruction); Morris, 46 F.3d at 417-18 (similar jury instruction).

The Appellants argue that evidence of the existence of multiple conspiracies came to light when John Langhout testified that he had been "stolen" by different individuals who wanted him to work for them and not for others. It is true that Langhout did testify that Ricardo Avila had "stolen me" from Octavio Rivera even though Avila had previously been working with (or for) Rivera. Subsequently, in preparation for the drug run from McAllen, Langhout testified that Felipe Gomez and Luis Quintero told him that Ricardo Avila was their enemy and that "Quintero wanted me to work for him and not work for Ricardo anymore."

The testimony of record is complex and sometimes inconsistent. As Langhout stated above, Quintero "wanted me to work for him," but Felipe Gomez later testified that he wanted Langhout "[t]o work for me," and then Gomez added that he was simply following the orders of Javier and Roberto Lopez. As to the other incident, Langhout

---

happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator. You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty even though that defendant may have been a member of some other conspiracy.

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

did testify that he was "stolen" by Ricardo Avila and he testified on cross-examination that Ricardo Avila and Octavio Rivera operated separate enterprises. On another occasion, however, Langhout testified on cross-examination that Avila and Rivera were "associates" but that he was unclear about any possible hierarchy because "[a]s a driver they kept me in the dark as much as possible."[3]

Based upon the entire record and viewing the evidence in the light most favorable to the government, we cannot say that the evidence would preclude a reasonable juror from finding beyond a reasonable doubt that each of the Appellants participated in a

---

[3]The colloquy on this point is informative:
  DEFENSE ATTORNEY ROBERTS: Do you [Langhout] recall mentioning to him [Agent Sperry] that, for instance, that Mario Bugarin was Octavio Rivera's partner?
  LANGHOUT: Yes.
  Q. Okay. And I suppose Ricardo Avila would also be one of Octavio's partners?
  A. Associates, yeah.
  Q. Was he a higher level than Octavio?
  A. As a driver they kept me in the dark as much as possible.
  Q. Okay.
  A. I mean Octavio--Ricardo initially, when I first went to El Paso, Ricardo was a source of marijuana for Octavio. I think they were cutting out middle men and stuff like that.
  Q. And didn't you discuss earlier in these early trips from Chula Vista that a man by the name of Raul was the Mexican source for the marijuana?
  A. He was Octavio's supplier, yes.
  Q. And do you recall mentioning Luis Quintero's name to Agent Sperry during this debriefing on February 12?
  A. No. This debriefing was separate from the McAllen bust.
  Q. And it was dealing mainly, I guess, with the Rivera organization, right?
  A. It was dealing with my prior trips before October 4th of '95.
  Q. Yes. But this would be the Rivera-Avila group, right?
  A. Oh, Octavio. Octavio and Rivera.
  Q. Octavio Rivera and Ricardo Avila?
  A. Ricardo Avila, yes.

13

single conspiracy as charged.  Thus, there was no fatal variance between the indictment and the evidence adduced at trial.

III.  INSUFFICIENT EVIDENCE

Appellant Gallardo maintains that the district court erred in denying his motion for judgment of acquittal based on the insufficiency of the evidence.

As stated above, this court reviews a claim of insufficient evidence to determine whether a rational trier of fact could have found that the evidence established the Appellant's guilt and each essential element of the crime beyond a reasonable doubt.  Ramirez, 145 F.3d at 350.  The evidence presented at trial is viewed in the light most favorable to the Government and with all reasonable inferences made in support of the jury's verdict.  Thomas, 120 F.3d at 569.

A conviction for conspiracy to possess and distribute a controlled substance, 21 U.S.C. §§ 846, 841(a)(1), requires proof beyond a reasonable doubt that demonstrates (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy.  Ramirez, 145 F.3d at 350; Thomas, 120 F.3d at 569.  Mere presence or association with actual conspirators "standing alone, will not support an inference of participation in the conspiracy."  United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992).  However, in meeting its burden, the government may rely on circumstantial

14

evidence tying the defendants together in order to prove conspiracy: "The agreement may be tacit, and the jury may infer its existence from circumstantial evidence." United States v. Crooks, 83 F.3d 103, 106 (5th Cir. 1996).

Addressing Appellant Gallardo's arguments here required a thorough consideration of the evidence in the record, but we are ultimately persuaded that the evidence sufficiently supports the jury's verdict. Our function is to assess whether any rational juror could conclude beyond a reasonable doubt that the government proved its case, and "we need not be persuaded that the evidence excludes every reasonable hypothesis of innocence." United States v. Velgar-Vivero, 8 F.3d 236, 239 (5th Cir. 1994), cert. denied, 511 U.S. 1096 (1994).

The evidence clearly supports such findings that Gallardo resided at the house at 2100 North Eighth Street in McAllen where a search after Gallardo's arrest turned up 638 pounds of marijuana. Likewise, despite Gomez's testimony to the contrary, there was substantial evidence that he knew the house was Gallardo's home. DEA Special Agent Anthony Santos testified that after advising Gallardo of his Miranda rights, Gallardo told him that he and his wife and his family resided at the house. DEA Special Agent Jack Arnold also testified that his investigation led him to conclude that a personal relationship existed between Gallardo and Maria Mesa and that they resided at the house. Felipe Gomez testified that he had been to this particular house twice before and that Ruben Gallardo was there both times. After his arrest, Agent

15

Santos testified that Gallardo consented to a search of the house and that Gallardo told him that marijuana would be found in the garage of the house. The search subsequently turned up 43 bundles of compressed marijuana which weighed 638 pounds in total.

Other testimony and evidence presented at trial ties Gallardo to this conspiracy. Lucy Miller identified Gallardo at trial as an individual who came to the Millers' hotel room in El Paso after Octavio Rivera informed them that someone would meet them there to transfer marijuana for a drug run. In addition, the two individuals arrested with Gallardo in McAllen each had something that linked them with Gallardo: Felipe Gomez had a slip of paper with Gallardo's name and a phone number on it, and Luis Quintero had a drug ledger which listed bundles of marijuana that corresponded to the markings on the bundles in Gallardo's garage. Written on the six small pieces of paper that Gallardo had when he was arrested were phone numbers of "Quintero" and "Felipe." There were also two phone numbers for "Ricardo Avila" which matched the numbers for Ricardo Avila given by John Langhout during his testimony. Langhout gave a cellular phone number for Avila and another number which he said that "[Avila] and Octavio [Rivera] shared."

In combination, this evidence constitutes a sufficient basis from which a reasonable juror could find beyond a reasonable doubt that the government had established Gallardo's guilt of the essential elements of the crime charged.

16

## IV.   PROSECUTORIAL MISCONDUCT

The Appellants contend that Assistant U.S. Attorney Juanita Fielden made improper statements during her closing argument in an attempt to bolster her own credibility and that of the federal DEA agents who testified during trial.  Appellants argue that AUSA Fielden exceeded the proper bounds of a closing argument when she claimed that people working for the United States--here, DEA agents and herself, a federal prosecutor--would not lie on the witness stand because of the risk of jeopardizing their careers. Appellants argue that these assertions improperly tied the federal officials' testimony to the authority of the United States and "vouch[ed] for the credibility of government witnesses on the basis of their status as government employees."

During the trial, Fred Miller testified as a cooperating witness for the government.  On cross examination, Mr. Miller was questioned about his cooperation with the government and what benefits he received in return.  As we noted earlier, the Millers were arrested in Missouri carrying marijuana they received in El Paso.  They then cooperated with federal authorities by making a monitored delivery in Piketon, Ohio.  The Millers were indicted in federal court in Ohio and although it is not absolutely clear from the record what they were charged with, it appears from statements made by Mr. Miller on cross examination and by the trial judge during a sidebar conference that they were charged with a drug conspiracy crime.   The indictment undoubtedly related to the marijuana in their vehicle, which they possessed because of their

participation in the conspiracy at issue in the present case. Significantly, the Millers cooperated with the federal prosecutors in Ohio and received reduced sentences for that cooperation. They were sentenced to a year and a day; Fred Miller served nine months in prison while Lucy Miller served seven months in a federal penitentiary.

In the present case, the defense attorneys questioned Mr. Miller about whether he had been offered anything in return for his testimony for the government. Although Mr. Miller's answers were confusing at times because it was unclear which case he was asked about (his Ohio prosecution or the present case), he testified that he received a reduced sentence in Ohio for his testimony but he denied that he was informed that he would not be prosecuted in the present case in Texas federal court. Miller stated clearly on two separate occasions that he had not received any promises from AUSA Fielden in return for his testimony in the present case. On redirect, Ms. Fielden asked, "Mr. Miller, have I promised you anything in return for your testimony?" Fred Miller's response: "No, ma'am."

At sidebar, the defense attorneys produced a letter that AUSA Fielden had sent on October 10, 1996, to the attorneys for the defendants in the present case.[4] The prosecutor's letter, sent

---

[4]The letters do not show that they were "cc'd" to anyone. Although the question of whether the Millers' attorney had received a copy arose at oral argument before this court, it appears that the Millers were not represented by counsel during this trial although they had been represented by public defenders in federal court in Ohio.

18

pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), informed the defense attorneys that the government witnesses Fred and Lucy Miller "in exchange for their co-operation and testimony, they will not be prosecuted for their involvement in this conspiracy." Following this sidebar conference, defense attorney Roberts asked Mr. Miller on recross whether he had been promised anything by AUSA Fielden in exchange for his testimony in this case.  Mr. Miller denied that Fielden had ever promised not to prosecute him in return for his testimony.

Because of the possible discrepancy between Mr. Miller's testimony and AUSA Fielden's <u>Giglio</u> letter, Fielden was called as a defense witness about the letter.  On the witness stand, Fielden admitted that she had written the letter but denied that she had ever communicated to Lucy and Fred Miller that they would not be prosecuted.  In response to a question asked by defense attorney Salas, AUSA Fielden stated:

> That was never communicated to them.  That was a letter addressed to you.  I never communicated with them.  The only time that I talked to Fred and Lucy Miller prior to their testimony was on Monday . . . October 14th, in my office.  At that time we discussed their testimony.  They did not ask, and I did not discuss any immunity from prosecution whatsoever.

In sum, Ms. Fielden asserted that she wrote the letters on October 10, 1996, and sent them to Appellants' attorneys before she had spoken with the Millers and that when she did talk with the Millers on October 14, 1996, she did not communicate any arrangement like the one she had described in the letters.

Appellants maintain that AUSA Fielden improperly attempted to

19

bolster the credibility of her testimony and that of the DEA agents who testified by invoking the authority of the United States and cloaking that testimony in the mantle of the federal government. During Fielden's closing argument, she stated (between defendants' objections):  "I repeat, do you think that agents for the federal government and a prosecutor for the federal government, for the United States of America, are going to risk their career and get on the stand and commit * * * would get on the witness stand and commit perjury and risk their career.  It's not going to happen, ladies and gentlemen."[5]

---

[5]That entire passage of the oral argument took place in the following manner:
    MS. FIELDEN:  These letters that I wrote--and I did write these letters.  Now, they have accused every government witness of lying, every government witness was lying that got on the stand, Steve Sperry, Steve Mattas, Jack Arnold, Kerry Keeter, Tony Santos, Michael Smith, Langhout, Millers, Gomez, Zamora.  And I guess they didn't address the El Paso PD.  But everybody is lying, and now they are accusing me of lying also. * * *
    I got on the stand, and what I told you was that I wrote this letter October 10.  I did not talk to Fred and Lucy Miller until October 14.  And that the subject –
    MR. ROBERTS:  Your honor, counsel is testifying at this point.  She did not testify to that.
    THE COURT:  Objection is overruled.  She did testify.
    MS. FIELDEN:  I did not speak to these people until October 14th.  The subject of whether or not they were going to be prosecuted did not come up.  This letter was written and sent to these people on October 10th, before I even laid eyes on Fred and Lucy Miller.
    Let's talk about some of the other things we've got here.  The other witnesses that they talk about, they were all lying except when they felt they said something beneficial to their client and then they were telling the truth.  Are they going to have it both ways?  Either they're lying or they're telling the truth.  But do you think that all those agents, and do you think a prosecutor for the United States is going to put their career on the line and get up and commit--
    MR. ROBERTS:   Your Honor, she is testifying as to her own credibility now in argument.
    THE COURT:  She's what?
    MR. ROBERTS:  She is bolstering her own credibility as a witness

20

AUSA Fielden's comments merit close attention because "it is particularly improper, indeed, pernicious, for a prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for convicting a criminal defendant." United States v. Goff, 847 F.2d 149, 163 (5th Cir. 1988) (citing United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979)). As this court has pointed out, "The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says." United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979) (quoting Hall v. United States, 419 F.2d 582, 583-84 (5th Cir. 1969)).

This court's review of an assertion of prosecutorial misconduct takes place in two steps. First, we must initially decide whether or not the prosecutor made an improper remark.

---

and a prosecutor, arguing here today, and giving her personal affirmation of her honesty.
 THE COURT: She's doing nothing more than responding to attacks by you, Mr. Lopez and Mr. Salas. Perfectly proper. Your objection is overruled. Go ahead.
 MR. ROBERTS: Thank you.
 MS. FIELDEN: I repeat, do you think that agents for the federal government and a prosecutor for the federal government, for the United States of America, are going to risk their career and get on the stand and commit –
 MR. ROBERTS: Your honor, I will renew the argument as to the other agents.
 THE COURT: No, you don't argue with me. You object.
 MR. ROBERTS: I'm sorry, your Honor. I would renew the objection as to her testifying that federal agents would not lie as being improper argument outside the record.
 THE COURT: She didn't say that. You're the one saying that. Anyway, your objection is overruled.
 MR. ROBERTS: Thank you.
 MS. FIELDEN: -- would get on the witness stand and commit perjury and risk their career. It's not going to happen, ladies and gentlemen.

<u>United States v. Munoz</u>, 150 F.3d 401, 414 (5th Cir. 1998).  If an improper remark was made, we must then evaluate whether the remark affected the substantial rights of the defendant.  <u>Id.</u> at 415; <u>Garza</u>, 608 F.2d at 663.

In assessing whether statements made by a prosecutor were improper, it is necessary to look at them in context.  <u>United States v. Washington</u>, 44 F.3d 1271, 1278 (5th Cir. 1995).  While AUSA Fielden could respond to the defense attorneys' statements in her closing argument, she cannot base her arguments on facts not in evidence or cloak her witnesses in the protective mantle of the United States government.  A prosecutor can argue that "'the fair inference from the facts presented is that a witness has no reason to lie.'"  <u>Munoz</u>, 150 F.3d at 414 (quoting <u>Washington</u>, 44 F.3d at 1278).  However, a prosecutor's closing argument cannot roam beyond the evidence presented during trial:  "Except to the extent [the prosecutor] bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses."  <u>Garza</u>, 608 F.2d at 663.

A majority of this panel is of the opinion that Fielden's remarks were improper because they referred to facts not in evidence and invoked the aegis of a governmental imprimatur.[6]  This panel unanimously agrees, however, that AUSA Fielden's remarks did not affect the substantive rights of the Defendants.

In determining whether Fielden's comments prejudiced the

---

[6]Judge Higginbotham disagrees, being of the opinion that the remarks were little more than the prosecutor making a fair inference from the facts presented.

Defendants' substantive rights, we assess "'(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt.'" Munoz, 150 F.3d at 415 (quoting United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995)). As this court has concluded in this context, "Proper supervision requires us at least to balance the need to protect the integrity of federal trials against the practical interest in giving finality to an accurate and fair verdict; we cannot by our supervisory power reverse a conviction for trial error that was harmless." United States v. Jones, 839 F.2d 1041, 1050 (5th Cir.), cert. denied, 486 U.S. 1024 (1988).

We conclude that the prosecutor's remarks during closing argument did not prejudicially affect the substantive rights of the defendants. As to the first factor, "[t]he magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect." United States v. Fields, 72 F.3d 1200, 1207 (5th Cir.), cert. denied, 519 U.S. 807 (1996). Given the strident advocacy on both sides of this case and the numerous witnesses, pieces of evidence, and issues placed before the jury, we cannot say that the prosecutor's statements overshadowed what had come before and unduly prejudiced the Appellants' case. In addition, the district court helped to mitigate any prejudicial effect by instructing the jury to base their decision solely upon the testimony and evidence presented:

> In reaching your decision to the facts, you may consider only the evidence admitted in the case. The term evidence includes the sworn testimony of the witnesses and the exhibits admitted in the record. Remember that any statements, objections or arguments made by the lawyers are not evidence in the case.

We presume that such instructions are followed "unless there is an 'overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the improper statement] is devastating.'" United States v. Tomblin, 46 F.3d 1369, 1390 (5th Cir. 1995) (quoting United States v. Barksdale-Contreras, 972 F.2d 111, 116 (5th Cir. 1992), cert. denied, 506 U.S. 1084 (1993)). Finally, in light of our review of Appellants' sufficiency of the evidence claims, we find that the remark by the government during closing argument does not outweigh the strength of the multifaceted evidence and testimony presented during trial. Viewing the statement in the context of the entire case, we conclude the argument of the prosecutor did not prejudice the Appellants' substantive rights.

V.   "MERE PRESENCE" COMMENTS DURING CLOSING ARGUMENT

Appellant Quintero contends that the government's statements about conspiracy law and "mere presence" during closing argument constituted prejudicial prosecutorial misconduct. Since defense counsel did not object to the prosecutor's statements, we must review Appellant's claim based upon plain error. United States v. Crooks, 83 F.3d 103, 107 (5th Cir. 1996).

We begin by noting that the government failed to respond in its brief to this point of error raised by Appellant Quintero.

24

This fact does not preclude our review of this issue. <u>United States v. Pryce</u>, 938 F.2d 1343, 1351 (D.C. Cir. 1991) (Randolph, J., concurring). Nevertheless, we feel compelled to observe that the government's failure to address legal issues raised by appellants is looked upon with disfavor because it imposes "unnecessary burdens" on the courts. <u>United States v. Rosa</u>, 434 F.2d 964, 966 (5th Cir. 1970) (per curiam).

Appellant Quintero makes two arguments. First, he contends that AUSA Fielden committed prejudicial prosecutorial misconduct in her closing argument at trial by suggesting that mere presence among drug conspirators is enough to make an individual part of a conspiracy and that this suggestion was an "end run" around conspiracy law. Second, Quintero claims that Fielden's closing argument was also improper because it alluded to facts that were not in evidence.

In her closing argument, AUSA Fielden stated:

> Members of the jury, there is one concept that I want you to keep in mind when you go back, one concept that has not been addressed here. You don't bring innocent people to a dope deal. Dopers don't create witnesses who can come in and testify against them in court. The people who come to dope deals, whether it's storing, transporting, buying or selling dope, are people who they can trust and who are part of their organization. You don't create a witness list. You don't bring innocent people to dope deals. Keep that in mind throughout this.

She reiterated this point at the very end of her closing argument: "You don't take innocent people to drug deals, ladies and gentlemen. You don't take innocent people around millions and millions and millions of dollars worth of marijuana if they are not part of the conspiracy."

25

It is undoubtedly true that an individual's mere presence around a drug deal or around drug conspirators does not make that individual a member of the conspiracy. United States v. Paul, 142 F.3d 836, 840 (5th Cir. 1998). At the same time, "'[a] jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present.'" Id. (quoting United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc)).

As noted, since no objection was made by the defendants to these statements,[7] we must review them for plain error. The appellate court must determine (1) whether there was an error, that is, a deviation from a legal rule, (2) whether that error was plain, which means obvious, and (3) whether the error affected the defendant's substantial rights, which means that it was prejudicial and affected the outcome of the trial. United States v. Hernandez-Guevara, 162 F.3d 863, 870 (5th Cir. 1998), cert. denied, 119 S.

---

[7]Mr. Salas, Appellant Gallardo's attorney, objected to another statement by AUSA Fielden on the basis that no evidence had been presented that supported Fielden's assertion:

MS. FIELDEN: What I found interesting about Mr. Quintero is he's showing up all over the place. For somebody . . . who is merely present. Remember, they don't take innocent people to dope deals. But you have him, John Langhout places him in El Paso with Ricardo Avila paying off a drug deal.

MR. SALAS: Objection, your Honor. There was no testimony to that effect.

THE COURT: I remember that as a matter of fact. Objection is overruled.

The district court was correct; John Langhout did testify that Ricardo Avila owed him $4000 for one of his trips to Chicago and that when he met Avila at a mall in El Paso to receive this payment, Luis Quintero was in the car with Avila.

26

Ct. 1375 (1999). The Supreme Court has said that such errors should lead to reversals only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993).

We are not persuaded by Appellant Quintero's contention that AUSA Fielden's remarks misled the jury as to conspiracy law by suggesting that mere presence indicates complicity. Even if her remarks constituted error, we conclude that Ms. Fielden's statements were not "plain" error because they did not clearly purport to be an explanation of law. AUSA Fielden did not clearly tie the statements to the legal elements of a drug conspiracy.[8] Moreover, "the magnitude of the prejudicial effect of the statement[]," United States v. Vaccaro, 115 F.3d 1211, 1215 (5th Cir. 1997), cert. denied, 118 S. Ct. 635 (1998), was so minimal that it could not have affected Quintero's substantial rights.

Appellant Quintero also claims that AUSA Fielden's closing argument touched upon evidence outside the trial record because no evidence was presented which demonstrated that those present during a conspiracy are always members of the conspiracy. It is true that "[a] prosecutor may not directly refer to or even allude to evidence that was not adduced at trial." United States v. Murrah, 888 F.2d 24, 26 (5th Cir. 1989).

---

[8]In an earlier part of her closing argument, AUSA Fielden described conspiracy in the following fashion: "Under conspiracy law we anticipate the judge will tell you that the government must show that each defendant agreed in some fashion to act towards that goal, to do something to further that marijuana trafficking operation, that the defendants knew of the purpose of the operation, and they joined with the intent of furthering it."

27

However, part of AUSA Fielden's statements arguably referred to "people who come to dope deals" as actual participants in drug handling activities that constitute more than mere presence during those activities. She referred to individuals who have a more involved role: "The people who come to dope deals, whether it's storing, transporting, buying or selling dope, are people who [drug conspirators] can trust and who are part of their organization." This court has held that participation in a conspiracy can be inferred from presence when it would be "unreasonable for anyone other than a knowledgeable participant to be present," Paul, 142 F.3d at 840 (citation omitted).

Assuming that some of the prosecutor's remarks impliedly referred to "evidence" not presented at trial, however, we do not think they did so with sufficient force or clarity to affect Appellant Quintero's substantial rights. In evaluating whether Appellant's substantial rights were affected by the government's closing argument, we consider the following factors: "(1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt." Vaccaro, 115 F.3d at 1215. We are not convinced that Ms. Fielden's statements were prejudicial because, as we noted above, she arguably limited part of her remarks to those individuals who had a role in storing, transporting, buying, or selling the marijuana. In addition, the district court specifically instructed the jury that statements by

28

the attorneys are not evidence[9] and that an individual's presence around a drug conspiracy or drug conspirators does not make that person a member of the conspiracy.[10]

In sum, we hold that the statements made by AUSA Fielden in her closing argument did not affect Appellant Quintero's substantial rights and do not warrant reversal.

## VI.    SENTENCING ISSUES

Each Appellant claims that the district court erred when it imposed his sentence.  Appellants Gallardo and Hernandez argue that the district court erred in overruling their objections to the denial of a two-level downward adjustment in their sentences based on their minor participation in the offense pursuant to § 3B1.2 of the Sentencing Guidelines.  Appellant Quintero contends that the district court erred in basing his sentence on an amount of marijuana that exceeded the amount seized in McAllen, Texas, when Quintero, Gomez, and Gallardo were arrested.

We review the district court's application and interpretation of the sentencing guidelines de novo.  United States v. Garcia, 86 F.3d 394, 400 (5th Cir. 1996), cert. denied, 519 U.S. 1083 (1997). We review the district court's factual findings at the sentencing

---

[9]In its charge to the jury, the district court stated: In reaching your decision to the facts, you may consider only the evidence admitted in the case.  The term evidence includes the sworn testimony of the witnesses and the exhibits admitted in the record.  Remember that any statements, objections or arguments made by the lawyers are not evidence in the case.

[10]This section of the jury instruction is reproduced in footnote 2, supra.

29

hearing for clear error. <u>Id.</u>

## A. Gallardo

Appellant Gallardo claims that the district court erred in overruling his objection to the denial of a two-level downward adjustment for his minor participation in the drug conspiracy. At sentencing, Gallardo argued that contrary to the characterization in the Presentence Investigation Report, he was not a "right-hand man" to various drug brokers. Rather, Gallardo claimed that he had a minor role because he only provided the stash house for the marijuana in McAllen. The district court denied this objection to the presentence report and the request for a two-level downward adjustment.

Appellant Gallardo asserts that in denying his request for a two-level reduction as a minor participant in this conspiracy, the district court erred by failing to articulate the basis for its finding. This court has held that the district court must "state for the record the factual basis upon which it concludes that a requested reduction for minor participation is, or is not, appropriate." <u>United States v. Melton</u>, 930 F.2d 1096, 1099 (5th Cir. 1991). At the same time, this court has "rejected the proposition that a court must make a 'catechismic regurgitation of each fact determined'; instead, we have allowed the district court to make implicit findings by adopting the PSR." <u>United States v. Carreon</u>, 11 F.3d 1225, 1230 (5th Cir. 1994). <u>See also</u> <u>Garcia</u>, 86 F.3d at 401 ("The district court can implicitly make such findings

30

by adopting the presentence report.").

We find that the district court made the necessary findings by adopting the presentence report. The district judge stated at the sentencing hearing and in the signed judgment that he agreed with and adopted the factual findings in Appellant Gallardo's presentence report. We affirm the district court's denial of Gallardo's request for a two-level downward reduction.


## B.   Hernandez

Appellant Hernandez also argues that the district court erred in overruling his objection to the denial of a two-level downward adjustment for his minor participation in the drug conspiracy. The presentence report on Hernandez prepared by a U.S. Probation Officer recommended a three-level increase under U.S.S.G. § 3B1.1 for Appellant's role as a manager or supervisor in this drug conspiracy. Hernandez objected to this three-level upward departure and, in turn, requested a two-level reduction as a minor participant in the drug distribution conspiracy. At sentencing, the district court agreed with Hernandez that he should not be given a three-level increase but denied his request for a two-level reduction as a minor participant.

Appellant Hernandez, like Gallardo, argues that in denying his request for a two-level reduction as a minor participant in this conspiracy, the district court erred by failing to articulate the basis for its finding. Although defense counsel argues that if Hernandez was not a manager or organizer then his role was

necessarily minor, that view is without merit.  This court has held that the downward departures outlined in § 3B1.2 are "designed to be applied infrequently, as many offenses are committed by actors of 'roughly equal culpability' . . . ."  United States v. Nevarez-Arreola, 885 F.2d 243, 245 (5th Cir. 1989)(quoting U.S.S.G. § 3B1.4, comment.).  In addition, we have ruled that a "downward adjustment under section 3B1.2 is generally appropriate only where a defendant was 'substantially less culpable than the average participant.'"  United States v. Brown, 54 F.3d 234, 241 (5th Cir. 1995) (quoting United States v. Buenrostro, 868 F.2d 135, 138 (5th Cir. 1989), cert. denied, 495 U.S. 923 (1990)).

We find that the district court made the necessary findings to deny Appellant's request for a two-level reduction.  Here, we are able to determine how the district court resolved these issues.  Cf. Carreon, 11 F.3d at 1231 (where court was left to "second guess the basis for the district court's calculation").  The district judge was clear in setting out Appellant Hernandez's role here:

> I'm not sure that I would use the example of the wheel conspiracy to describe this particular case.  But it is obvious that Mr. Hernandez's role in the offense was as a receiver and then purchaser and then redistributor of marijuana, and that's how he fit in, just like other people [defense counsel] mentioned like . . . Ute Serrano was another one.  She was up in Michigan City.  And you had Sergio Zamora.  He was down in Indianapolis, I believe.  And your man was the customer, so to speak, in Detroit.  And what he did with the marijuana after it got to him, we can only speculate.  But that was his participation in this conspiracy.

Given that the district court found that the applicable amount of marijuana attributable to Hernandez was 567 kilograms, the judge denied the request for the two-level downward departure:  "I

32

certainly don't think that he is entitled to an adjustment downward for having a minor role or less in the offense, but by the same token, I can't see him as being qualified as a manager-supervisor, organizer or leader. That just doesn't fit, doesn't fit his position in this conspiracy." We conclude that the district court properly and sufficiently articulated the basis for its denial of Appellant's request for a downward departure.

## C. Quintero

Appellant Quintero claims that the district court erred in basing his sentence on an amount of marijuana that exceeded the amount seized in McAllen when he was arrested. The presentence report attributed 3,643.97 kilograms of marijuana to Quintero which would establish a base offense level of 34. At the sentencing hearing, however, the district court reduced Quintero's base level to 32 which applies for amounts of marijuana between 1,000 and 3,000 kilograms. The district judge observed that "from what I heard in the trial it's beyond dispute that his relevant conduct was involved with at least 1,000 kilograms of marijuana."

In a drug conspiracy case, sentencing must take into account the drugs with which the defendant was directly involved but also those that can be attributed to him as part of his "relevant conduct" under § 1B1.3 of the Sentencing Guidelines. United States v. Puig-Infante, 19 F.3d 929, 942 (5th Cir.), cert. denied, 513 U.S. 864 (1994). Relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the

33

jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (Nov. 1995).[11] The district court's determination of relevant conduct is a factual finding that we review for clear error. Puig-Infante, 19 F.3d at 942.

Here, there is ample evidence that Appellant Quintero's relevant conduct involved more than 1000 kilograms of marijuana. The amount seized in McAllen totaled 495 kilograms (1092 pounds). Moreover, John Langhout testified that he met with Quintero and Felipe Gomez in McAllen prior to their arrest and that he (Langhout) was told that Quintero had an additional 2000 kilograms stored in Reynosa, Mexico. The presentence report on Quintero concluded that he was a main source for the marijuana shipped from southern Texas. Two instances from the presentence report are representative of the depth of Quintero's involvement. On one of John Langhout's drug deliveries, Quintero was the source for approximately 181 kilograms (400 pounds) of marijuana that Ricardo Avila transferred to Langhout in El Paso. Ricardo Avila also indicated that Quintero took him and another individual to an apartment in Chicago where Quintero gave them approximately 45 kilograms (100 pounds) from the approximately 408 kilograms (900 pounds) stored there.

At sentencing, the district court "adopt[ed] the factual findings" in the presentence report except that instead of the 3,643.97 kilograms attributed in the report to Appellant Quintero,

---

[11]Since sentencing occurred on February 27, 1997, we use the Sentencing Guidelines in effect at that time. United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

the district court found that only between 1,000 and 3,000 could be attributed to Quintero. Since we conclude that these findings were not clearly erroneous, we affirm the district court's calculation of marijuana attributable to Quintero.

## VII. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions and sentences of Appellants Gallardo, Hernandez, and Quintero.