IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 7, 2008

Charles R. Fulbruge III
Clerk

No. 06-40489

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

HUMBERTO MARTINEZ-LARRAGA; FRANCISCO JAVIER GARZA-
GUEVARRA; MANUEL GUEVARRA-RODARTE; AMADO ROMEO-ORTIZ

Defendants-Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.
GARWOOD, Circuit Judge:

Appellants Humberto Martinez-Larraga ("Martinez-Larraga"), Francisco Javier Garza-Guevarra ("Garza-Guevarra"), Manuel Guevarra-Rodarte ("Guevarra-Rodarte"), and Amado Romeo-Ortiz ("Romeo-Ortiz") (collectively, "the defendants") were convicted by a jury of conspiracy to possess with intent to distribute more than 100 kilograms of marihuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), and of possession of more than 100 kilograms of marihuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). They were indicted following the United States Border Patrol agents having caught them, on September 30, 2005, carrying bundles of

marihuana north from the Mexican border near Brownsville, Texas. The four defendants each primarily argue that their convictions should be reversed and remanded for new trial because the prosecutor commented on their post-arrest, pre-trial, silence during its rebuttal closing argument. Martinez-Larraga, Romeo-Ortiz,[1] and Guevarra-Rodarte[2] also argue that their convictions should be reversed and remanded for new trial because the government improperly bolstered its witnesses' testimony during closing argument. Finally, Romeo-Ortiz additionally complains that the district court erred by denying him a downward adjustment of his base offense level pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3B1.2.

## FACTS AND PROCEEDINGS BELOW

On September 30, 2005, Border Patrol agents were observing an area known as a "hot spot" for drug smuggling activity on the border between Texas and Mexico near the Rio Grande river. Agent Jesus Sanchez saw a man stop at

---

[1] Romeo-Ortiz adopts the arguments of his codefendants in his brief. See FED. R. APP. P. 28(I).

[2] In his reply brief, but not his original brief, Guevarra-Rodarte attempts to adopt Martinez-Larraga's argument, as set forth in both his original and reply briefs, that the government improperly bolstered its witnesses' testimony in closing argument. It is not entirely clear whether he may do so. FED. R. APP. P. 28(I) indicates that a party may adopt by reference a portion of another's brief, and that "[p]arties may also join in reply briefs." This language could indicate that Guevarra-Rodarte may adopt the arguments made by his codefendants in their reply briefs. It also could be interpreted to mean that in his reply brief, Guevarra-Rodarte may adopt all of the arguments of his codefendants, even those made in their original briefs. However, arguments not asserted in an original brief are generally deemed to be abandoned. Haspel & Davis Milling & Planting Co. v. Board of Levee Commissioners of the Orleans Levee District, 493 F.3d 570, 579 n.29 (5th Cir. 2007). In an unpublished opinion, this court has held that one codefendant may not adopt the arguments of another codefendant for the first time in a reply brief. See United States v. Cugno, No. 05-51758, slip op. at 10 n.4 (5th Cir. Aug. 13, 2007); see also United States v. Bieganowski, 313 F.3d 264, 281 n.14 (5th Cir. 2002) (indicating that the law remains unclear on this issue, but finding it unnecessary to resolve the issue in that case). Because we conclude that the district court did not improperly allow the prosecutor to bolster the government witnesses' testimony, we need not and do not decide whether Guevarra-Rodarte's appellate briefing adequately preserves this contention for purposes of his appeal.

the top of a levee, whistle, and wave his hands. Within seconds, four men carrying large bundles walked to the top of the levee where this scout stood. When Agent Sanchez saw the four men carrying the bundles, he alerted his fellow Border Patrol agents. He watched the four men through his binoculars as they moved north, but lost sight of them for approximately two minutes. Agent Miguel Angel Rodriguez found and confronted the four men carrying the bundles. He drew his gun and instructed them to stop. Three of these men, Garza-Guevarra, Guevarra-Rodarte, and Romeo-Ortiz, stopped with their bundles, but the fourth dropped the bundle he was carrying and ran from Agent Rodriguez. Agent Rodriguez then informed a third agent, Agent Julio Tijerina, that one of the men had run. Agent Tijerina captured Martinez-Larraga, who fit Agent Rodriguez's description, approximately forty-five yards from Agent Rodriguez hiding beneath a shrub. All of the men were arrested. The four bundles recovered from the scene contained in total approximately 107.77 kilograms of marihuana.

Border Patrol agents read the defendants their Miranda rights both at the scene of the arrest and again at the Border Patrol station. Defendants invoked their right to remain silent and made no statements. Counsel was later appointed for each of them.

On October 18, 2005, the defendants were charged by indictment with conspiracy to possess with intent to distribute approximately 107.77 kilograms of marihuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), and with possession of the same quantity of marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Their consolidated trial took place from December 12-14, 2005, and a jury convicted each of the defendants on both counts.

During trial, the government's witnesses were the three Border Patrol agents who patrolled the area where the defendants were arrested and the Drug

Enforcement Administration agent who inspected the bundles of marihuana. The defendants did not testify or present any witnesses or other evidence. The first witness to testify was Agent Sanchez. After several pages of testimony as to his observations of the area and witnessing of defendants carrying the bundles, and their apprehension, the prosecutor asked Agent Sanchez about when the agents read the defendants their Miranda rights after their arrest. That portion of the questioning was as follows:

> "Q [prosecutor]    After these four individuals were arrested – were they apprehended?  Were they arrested?
>
> A [Agent Sanchez]    Yes, sir.
>
> Q    Where were they taken?
>
> A    We usually read their rights out in the field, Mirandized them with our card.
>
> Q    What are the Mir – can you tell us what Miranda rights are?
>
> A    The Miranda rights are – they can be read to them out in the field.  We have a card for them.  Unfortunately, I don't have that with me.  I usually carry it with my uniform.  It was read by Miguel A. Rodriguez to them.
>
> Q    At the scene?
>
> A    At the scene before we actually cleaned up, picked up everything, and we moved out of there.
>
> Q    And did they invoke the right to remain silent, to your knowledge?
>
> A    At that time we just asked them if they understood their rights, and we put them in the vehicles.  And we clear the area because we don't know how hot it is, if there's any other individuals out there.
>
> Q    So when you took them to the station, did you advise them

of their rights?

A        Once upon arriving at the station, we give them their 214, which is a government form, and they read the rights again.  And we ask them again do they understand their rights or do they want somebody to help them out, and they invoked their rights.

Q        Okay.  And were these rights given to them in Spanish?

A        Yes.

Q        So you didn't ask them any questions?

A        No, sir."

During cross examination of Agent Sanchez, counsel for Garza-Guevarra also elicited the following testimony:

"Q [counsel for Garza-Guevarra]     Okay.  And you didn't take any statements from any of the three individuals or the four individuals that you apprehended, correct, because you said –

A [Agent Sanchez]     They invoked their rights.

Q        Excuse me?

A        They invoked their rights.

Q    Okay.  And so you don't have any statements from any of those four individuals either?

A        That's correct."

The second witness was Agent Tijerina, who testified to his apprehension of Martinez-Larraga and return of him to where the other three defendants and four bundles were.  The prosecutor then elicited from Agent Tijerina testimony on Miranda warnings:

Q [prosecutor]  Now, were you the person that basically read the Miranda warnings there at the scene to the individuals?

A [Agent Tijerina]    Not at the scene, sir.  At the scene, it was Officer Miguel Rodriguez.

Q    And what about at the processing?

A    At the processing area, yes, sir, I served them with a – it's a Form 214 rights, and we do that formally for the individuals.  I read all four of them their rights.  They went ahead and signed it, acknowledging that they did not want to answer any question.

Q    And did you ask them any more questions?

A    No, I didn't, sir."

At no time during any of the proceedings below was any character of objection, complaint or request for relief made by or on behalf of any party

respecting any of the above quoted testimony of Agents Sanchez and Tijerina.[3]
Nor has the admission of any such testimony been assigned as error on appeal.

_____

[3] These inquiries into the advice concerning and exercise of Miranda rights seem to have had their genesis in the following circumstances. At a conference between the court and counsel on December 12, 2005 (just after the jury had been selected and retired until the next morning when opening statements would be made) the prosecutor advised that the agents' report, copies of which had been furnished defense counsel, reflected that "all four [defendants] were given their Miranda rights and nobody said anything" and that "all four individuals invoked their rights, and they didn't say anything except for biographical data." However, the prosecutor further stated that "[a]ccording to one of the agents while he was conducting biographical data, one of them said the reason he did it was he was forced by someone in Mexico;" however "they didn't pursue it any further because they had already given him his Miranda warnings." The prosecutor said that counsel for Martinez-Larraga "brought it to my attention someone had said that." Counsel for Martinez-Larraga confirmed he had mentioned this to the prosecutor and that his client had "indicated to me that he told the agents that arrested him, he goes, 'Hey, you know, somebody forced me to do this' . . . ." The prosecutor said that earlier that morning (December 12) "when the agent was coming in, I told him to go and confirm who was the one that said it, and it was Mr. Troiani's client [Garza-Guevarra], according to the agent." Two defense counsel expressed concern about this, noting that the statement amounted to an admission and that it might implicate the other defendants, and that it was unclear whether more than one defendant made such a statement. The court directed that the prosecutor allow defense counsel to interview the agents. The next morning (December 13), before the jury was brought in, at a conference with the court and counsel, the prosecutor announced "I had the witnesses available for all defense counsel, but . . . my understanding is that they're going to not touch that question, and I'm not going to bring it out through the witnesses, Your Honor." Counsel for Garza-Guevarra argued that was correct, and no counsel suggested otherwise. The following then transpired:

> "MR. CASAS [counsel for Martinez-Larraga]: Your Honor, I did want to make a motion on the record. In the event that it comes up, that defense comes up, that is coercion or a justification or any type of duress defense by Defendant Francisco Javier Garza-Guevara, we believe that it would be mutually exclusive and antagonistic . . . to the defense posture and position of Mr. Martinez-Larraga, and we'd be moving for a severance.
>
> THE COURT: In the event it comes up? Okay.
>
> MR. CASAS: Well, I mean, I'm being assured that it's not going to come up. But in the event that it, you know –
>
> THE COURT: All right. I guess we'll cross that road when we come to it."

No motion to sever was ever made.

During closing arguments, counsel for Guevarra-Rodarte argued that the government had not proven that the defendants were guilty beyond a reasonable doubt. In doing so, he indicated that the government had no testimony from the defendants regarding the alleged conspiracy, and no testimony regarding whether they knew that there was marihuana in the bundles:

> "How did the government show that they [the Defendants] all had a plan together? Were there any statements made between any of these individuals? No, there were not. Was there any testimony from the group here that said, 'Oh, we all acted together'? No, there was none of that testimony. . . .
>
> Has the government presented any evidence where these individuals knew what was in the bundles they were carrying, if they were carrying them at all? Has the government come over here and said, 'Well, this person here admitted that it was marihuana'? . . . Did the government provide you with any of that information? Did the agents testify that these individuals knew that they were carrying contraband?"

The prosecutor's rebuttal closing argument, which appears as several pages in the transcript, included the following brief response to the foregoing argument concerning lack of proof of knowledge in that there was no showing any defendant "admitted that it was marihuana." The prosecutor stated:

> "Another thing is you've heard the saying actions speak louder than words. Well, here the actions speak louder than words. They were caught with the marijuana. It was on their persons. And you heard there's no testimony that they knew. You heard the agents, that they basically lawyered up. They didn't make any statements. You can surmise by their actions . . . "

At that point, counsel for Romeo-Ortiz interrupted the prosecutor, and addressed the court, stating, "Your Honor, I'm going to object to the prosecution trying to switch the burden. There is no burden for a defendant, and there is no inference made by silence." The prosecutor responded: "Your Honor, they brought it up, Your Honor. The defense counsel brought it up." The court did not explicitly sustain or overrule the objection, but instructed the jury, "The jury will

remember my instructions. The burden of proof is on the government until the very end of the case." The prosecutor continued:

> "We accept the burden, and actions speak louder than words. You saw what they did. You saw the two agents. These are the agents that are there every day. Every day they're out there. And you saw them. It's a question of do you believe them or not? Do you believe these agents or not? Why would they get up here and try to make up lies or make up suggestions and so forth? They were there. They're telling you what they saw, so it's a question whether you believe these agents or not."

At this point, counsel for Martinez-Larraga approached the bench and stated: "I think Mr. Esquivel [the prosecutor] has crossed the line. We need to comment on the defendants' right to remain silent, and we move to . . . I want to put that on the record that we move for a mistrial."[4] The court overruled the motion.

After closing arguments, the district court released the jury for the day. The next morning, when court reconvened, the district court gave the jury this admonishment before allowing it to retire for deliberations:

> "Before you begin deliberations, though, I want to give you one further instruction. Right before we adjourned at the very end of the government's argument, a reference was made that when the defendants were arrested, they didn't make any statements to the officials, and I want to -- I reminded you at the time that the government bears the burden of proof until the very end of the case.
>
> And now before you begin your deliberations, I want to remind you that as a part of the defendant's right to remain silent under the 5th Amendment, not only do they not have to testify or put on any evidence, but they also don't have to talk to law enforcement officials. And so I'm instructing you that they're -- the comment that was made, the refusal to talk to agents and that they made a request for counsel was a lawful exercise of their rights, and you

---

[4] Counsel for Romeo-Ortiz and Garza-Guevarra joined in the motion immediately. Counsel for Guevarra-Rodarte did not join the motion at that time. However, after the jury was dismissed for the day, counsel for Romeo-Ortiz asked the court, "Just for the record, Your Honor, the motion for mistrial was for all four defendants and was denied as to all four?" The court responded that that was the case.

should not infer guilt or anything else from their exercise of those rights.

The law prohibits you in arriving at your verdict from considering the fact that a defendant may have exercised his or her 5th Amendment rights, and so I'm instructing you that you should ignore that comment in its entirety, all right?"

The jury then retired to begin its deliberations, after which counsel for Martinez-Larraga, joined by the other defendants, stated "we would again renew our motion for a mistrial. Despite the judge's curative instructions, we believe that the taint cannot be removed with any instruction, and we ask again for a mistrial." The district court responded that it did not "see the comment or the argument as being that harmful to begin with, given the context in which it was made." It concluded, "Secondly, I didn't think the motion made yesterday or the motion made today was timely, but that's not the only reason I overruled it. I don't think it merits a mistrial, so I'm overruling the motion."[5]

Later that morning the jury returned its verdict finding each defendant guilty on each count.

On March 31, 2006, the district court sentenced each of the defendants to sixty-three months' imprisonment and four years' supervised release, on each ount, with the sentences on each count to run concurrently. Each defendant timely filed his notice of appeal.

## DISCUSSION

We limit our discussion to the issues raised by the parties on appeal: Whether the defendants' convictions should be reversed because the prosecutor improperly commented on their post-arrest, pre-trial, silence; whether the defendants' convictions should be reversed because the prosecutor improperly bolstered the testimony of the Border Patrol agents; and whether the district

---

[5] No objection was made below, or has been raised on appeal, as to anything stated in, or omitted from, any of the district court's instructions to the jury.

court erred in failing to assess Romeo-Ortiz a minor role adjustment pursuant to U.S.S.G. § 3B1.2. For the reasons stated below, we affirm the judgment of the district court.

A. Prosecutor's Comments About Defendants' Post-Arrest Silence

The defendants argue that their convictions should be reversed because the prosecutor deprived them of a fair trial by improperly referring to their post-arrest silence during his rebuttal to the defendants' closing argument. The defendants timely objected to these statements by moving for a mistrial. They argue that by making these statements, the prosecutor violated their Fifth Amendment rights.

Two of the clauses of the Fifth Amendment are arguably relevant here, viz: the self-incrimination clause providing that no person "shall be compelled in any criminal case to be a witness against himself," and the due process clause providing that no person shall "be deprived of life, liberty, or property, without due process of law."

In Griffin v. California, 85 S.Ct. 1229, 1232 (1965), the Supreme Court held that the Fifth Amendment's self-incrimination clause (as applicable to the states under the Fourteenth Amendment) precluded the prosecution from arguing to the jury that the accused's failure to testify at the trial was evidence of his guilt. In Miranda v. Arizona, 86 S.Ct. 1602 (1966), the Court held that, in order to effectuate the self-incrimination clause of the Fifth Amendment (applicable to the states under the Fourteenth Amendment), evidence of statements made by the defendant to law enforcement officers while under custodial interrogation could not be admitted in the defendant's criminal prosecution unless preceded by the now familiar Miranda warnings. Id. at 1612-13, 1621. See also id. at 1624-25 n.37 ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police

custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.").

The Court has held that the prosecution's introduction at trial of evidence of the accused's silence after being given Miranda warnings following arrest violates the due process clause. Doyle v. Ohio, 96 S.Ct. 2240 (1976). The Supreme Court has explained that "Doyle rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial'." Wainwright v. Greenfield, 106 S.Ct. 634, 638 (1986) (quoting South Dakota v. Neville, 103 S.Ct. 916, 923 (1983)). In Wainwright the court applied Doyle even though the defendant did not testify. Id. at 636. Wainwright further casts doubt on the applicability of the self-incrimination clause in this setting, stating:

> "Notably, the Court in Doyle did not rely on the contention that Ohio had violated the defendants' Fifth Amendment privilege against self-incrimination by asking the jury to draw an inference of guilt from the exercise of their constitutional right to remain silent. Cf. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Fifth Amendment prohibits prosecutorial comment on defendant's refusal to testify)." 106 S.Ct. at 639 n.7.[6]

Defendants' arguments on appeal somewhat differ from one another in that Guevarra-Rodarte and Martinez-Larraga contend that the prosecutor's argument violated Doyle and their due process rights, while counsel for Garza-Guevarra contends that the argument violated his Fifth Amendment right against self-incrimination, citing Griffin, and counsel for Romeo-Ortiz simply "adopts the arguments of all codefendant/appellants" (without any explanation, elaboration or specification). The initial objection below was made by counsel for

---

[6] We also note that this court has not resolved, and there is a circuit split as to, whether the Fifth Amendment privilege against self-incrimination prohibits prosecution proof, as substantive evidence of guilt, of a nontestifying defendant's post-arrest, pre-Miranda warning silence not in response to custodial interrogation. See United States v. Salinas, 480 F.3d 750, 758-59 (5th Cir. 2007); United States v. Frazier, 408 F.3d 1102, 1110-11 (8th Cir. 2005).

Romeo-Ortiz; both motions for mistrial were made by counsel for Martinez-Larraga.

We think it clear that there was no comment on the failure of any defendant to testify. The complained of argument by the prosecutor was obviously in response to the argument of Guevarra-Rodarte's counsel that: "Has the government presented any evidence where these individuals knew what was in the bundles they were carrying, if they were carrying them at all? Has the government come over here and said, 'Well, this person here admitted that it was marihuana?" (emphasis added). In response, the prosecutor argued: "They were caught with the marijuana. It was on their persons. And you heard there's no testimony that they knew. You heard the agents, that they basically lawyered up. They didn't make any statements." The prosecutor's reference is plainly and unambiguously to the agents' wholly unobjected to testimony that the defendants made no statements to the agents. Absolutely nothing the prosecutor stated could be construed as referring to the failure of the defendants to testify.[7]

What we clearly have here is a comment on the defendants' silence pretrial, post-arrest, post-Miranda warnings. So far as we are aware the Supreme Court and this court have always addressed such a situation under Doyle, and we will likewise do so here, although self-incrimination clause cases may also inform the analysis.

Doyle succinctly describes its holding as follows:

"The question in these consolidated cases is whether a state prosecutor may seek to impeach a defendant's exculpatory story, told

---

[7] Moreover, it is plain that the defendants and the district court understood the prosecutor to be referring only to the defendants' failure to make any statements to the agents. Neither the objection by counsel for Romeo-Ortiz nor the motions for mistrial in any way complain of any comment on the failure to testify, and the district court's curative instruction reflects the same understanding concerning the complained of "comment that was made, the refusal to talk to agents and that they made a request for counsel was a lawful exercise of their rights, and you should not infer guilt or anything else from their exercise of those rights."

for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest. We conclude that use of the defendant's post-arrest silence in this manner violates due process. . . ." 96 S.Ct. at 2241 (footnote omitted; emphasis added).

However, Doyle also expressly recognizes that a prosecutor's reference to a defendant's post-Miranda silence may properly be made where it is not "used to impeach" the defendant's "exculpatory story", or as substantive evidence of guilt, but rather to respond to some contention of the defendant concerning his post-arrest behavior. See 96 S.Ct. at 2245 n.11 (citing United States v. Fairchild, 505 F.2d 1378, 1383 (5th Cir. 1975). In Fairchild we stated that where the defendant had "opened the door" respecting his post-arrest interaction with the authorities "he discarded the shield which the law had created to protect him" from comment on his post-arrest silence, although the prosecution still could not go beyond a proper response so as to use the silence "as direct evidence" of guilt. Id., 505 F.2d at 1383. We, and other circuits, have continued to recognize this "open the door" or "reply" exception to Doyle, see, e.g., United States v. Allston, 613 F.2d 609, 611 (5th Cir. 1980); United States v. Shue, 766 F.2d 1122, 1129 (7th Cir. 1985), while likewise recognizing that it does not permit the prosecution to argue "that the jury should infer . . . [the defendant's] guilt directly from his post-arrest silence," United States v. Rodriguez, 260 F.3d 416, 421 (5th Cir. 2001).

The same basic rationale of this Doyle exception has likewise been applied in cases dealing with prosecutorial comment on the defendant's failure to testify. Thus, where defense counsel argued that the government had not given the defendant a chance to explain his actions and the prosecutor responded by stating that he "could have taken the stand and explained," the Supreme Court held that the response did not infringe on the defendant's Fifth Amendment rights or violate Griffin. United States v. Robinson, 108 S.Ct. 864 (1988). The

Court held that the prosecutor was entitled to make "a fair response" to defense counsel's argument and, quoting from Justice Steven's concurring opinion in United States v. Hastings, 103 S.Ct. 1974, 1984 (1983), observed that "'the protective shield of the Fifth Amendment should [not] be converted into a sword." Robinson goes on to say that "it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another," 108 S.Ct. at 869, and rejected the notion that the prosecutor's response should be considered the equivalent of treating "a defendant's exercise of his right to silence at trial as substantive evidence of guilt." Id. at 870.

We conclude that the prosecutor's rebuttal argument's brief reference to the jury having "heard the agents" (who had testified that defendants were warned under Miranda and invoked their rights) and that "they [defendants] didn't make any statements" was a fair response to defense counsel's argument that there was no evidence defendants knew what was in the bundles because there was no evidence "this person here admitted it was marihuana." The prosecutor's said argument in this respect was simply an explanation of why there were no statements, the absence of which defense counsel had alluded to, thus invoking silence as a sword rather than a shield and opening the door to a response. The referenced response was not an assertion that the jury should infer defendants' guilt directly from their post-arrest silence.[8]

---

[8] The other three defendants argue that Guevarra-Rodarte's counsel cannot have "opened the door" as to them. In the present context, this contention is unavailing. We note that no such argument was made below, nor was any instruction ever requested that the prosecution's now complained of response be disregarded as to the other defendants or the like. Nor was any severance ever requested. Moreover, the remarks in question of Guevarra-Rodarte's counsel was not made in reference to that particular defendant but rather in respect to all the defendants collectively and without differentiation. No defendant objected to that or did anything to disavow those remarks or that aspect of them. Further, counsel for Garza-Guevarra had, on cross examination of Agent Sanchez, brought out the fact all the defendants had invoked their rights and made no statements; as noted above there was never any objection or motion whatever in respect to any of that testimony or similar testimony in the

There is, however, one rather troubling aspect of the prosecutor's response, namely the statement that "they [defendants] basically lawyered up." It is, at best, highly questionable that this brief, unrepeated comment qualifies as a fair response. The appropriate response to the defense criticism that the prosecution had not presented any statements by any of the defendants, is that such was not due to the disinterest of the agents or the prosecution in what the defendants had to say, or to their holding back any denial or explanation which had been offered by any defendant, but rather to the defendants' own choice to exercise their Miranda right to silence of which the agents had advised them. That they did so because "they basically lawyered up" is essentially irrelevant to the prosecution's otherwise legitimate response.[9]

However, even assuming that the prosecutor violated the defendants' constitutional rights, any error committed by the prosecutor was harmless beyond a reasonable doubt. When faced with a Doyle violation, this court must determine if, absent the prosecutor's improper statements, it is clear beyond a reasonable doubt that the jury would have found the defendant guilty in any event. Brecht v. Abrahamson, 113 S.Ct. 1710, 1717 (1993). If this is clear, the error is harmless, and the defendant's conviction should not be reversed.

The typical Doyle case – indeed Doyle itself – involves the prosecution's use of the defendant's post-Miranda silence "to impeach a defendant's exculpatory story, told for the first time at trial." Doyle, 96 S.Ct. at 2241. For purposes of determining whether a Doyle error requires reversal we have categorized Doyle cases according to how directly or expressly the prosecution "links the

---

prosecutor's direct examination of Agent Sanchez and Agent Tijerina. See also note 3 supra.

[9] Moreover, there is really no adequate support in the evidence for any "lawyering up" at that time. The only evidence in that respect is Agent Sanchez's brief unexplained and unrepeated statement that "we ask them again do they understand their rights or do they want somebody to help them out, and they invoked their rights" (emphasis added).

implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent." See Chapman v. United States, 547 F.2d 1240, 1249-50 (5th Cir. 1977); see also Rodriguez, 260 F.3d at 422.[10] Here, however, there is no exculpatory story whatever, either through testimony of any defendant or through any other evidence, whether from the defense or the prosecution.

Further, the district court, clearly and fully instructed the jury, just before it retired, that the defendants had the Fifth Amendment right not only not to testify or put on any evidence, but also the right not to talk to law enforcement and to request counsel and that the jury should not infer guilt, or anything else, from defendants' exercise of those rights and should disregard the prosecutor's challenged comment "in its entirety."

Moreover, the prosecutor's brief and unrepeated "lawyered up" statement was, in context, part of response to the defense argument about the absence of statements and was not explicitly or clearly an attempt to use the lawyering up as direct evidence of defendants' guilt to or directly link it to rebutting any exculpatory story or defense advanced.

Finally, there is "overwhelming evidence" of the defendants' guilt. United States v. Hasting, 103 S. Ct. 1974, 1982 (1983) (holding that the prosecution's Griffin error was harmless beyond a reasonable doubt in light of "overwhelming evidence of guilt"). They were caught by Border Patrol agents with bundles of marihuana. Although one of the four men stopped by Agent Rodriguez ran from him, he was caught by another agent only a few minutes later, and there is absolutely nothing to suggest that the agents caught the wrong man. The defendants presented no evidence or witnesses at trial, nor did they present any

---

[10] Fifth Circuit cases subsequent to Chapman have substantially modified its apparent rigidity, have recognized that many cases fall somewhat between its categories, and have declined to reverse even where the exculpatory story is not totally implausible but the evidence of guilt is substantial or overwhelming. See Alderman v. Austin, 695 F.2d 124, 125-26 n.7 (5th Cir. Unit B 1983) (en banc); United States v. Rodriguez, 43 F.3d 117, 121-22 (5th Cir. 1995).

defense or theory of the case. At trial and on appeal, defendants stressed that, among other things, the bushes and grass were four to five feet tall where the defendants were arrested and that Agent Sanchez lost sight of the four men (whom he identified at trial) carrying bundles for two minutes just before the defendants were arrested. They suggest that with this evidence, "the jury could infer that the men fell down to the ground at a point where someone left hidden bundles." However, no evidence suggests that Agent Rodriguez, who caught and arrested the men, could not clearly see them, as he testified he had, carrying the bundles of marihuana. The Border Patrol agents caught the defendants red-handed with illegal drugs.

In light of the overwhelming evidence of the defendants' guilt and the cautionary instructions given to the jury, it is clear beyond a reasonable doubt that the jury would have found the defendants guilty in the absence of the prosecutor's challenged comments during closing argument. See, e.g., Cotton v. Cockrell, 343 F.3d 746, 752 (5th Cir. 2003) (holding that "[g]iven the overwhelming evidence of guilt and the court's cautionary instruction to the jury . . . the prosecution's statement had no substantial and injurious effect or influence in the determination of [the defendant's] guilt"). Because any improper comment made by the prosecutor was harmless beyond a reasonable doubt, we affirm the decision of the district court denying the defendants' motions for a mistrial.

## B. Bolstering Witnesses' Testimony

Defendants also argue that the prosecutor impermissibly bolstered the witnesses' testimony.[11] In his closing argument, the prosecutor stated:

---

[11] Martinez-Larraga asserts this argument in his brief, while Romeo-Ortiz adopted all of the arguments of his codefendants in his. Garza-Guevarra does not assert this argument. In his reply brief, Guevarra-Rodarte attempted to adopt the argument from the brief of Martinez-Larraga. As discussed supra, note 2, it is not clear whether he may adopt a new argument in his reply brief, but it is not necessary to decide that issue in this case.

"These are the agents that are there every day. Every day they're out there. And you saw them. It's a question of do you believe them or not? Do you believe these agents or not? Why would they get up here and try to make up lies or make up suggestions and so forth? They were there. They're telling you what they saw, so it's a question whether you believe these agents or not."

A prosecutor should not invoke the sanction of the government as a basis for convicting a defendant. United States v. Ramirez-Velasquez, 322 F.3d 868, 874 (5th Cir. 2003) (quoting United States v. Gallardo-Trapero, 185 F.3d 307, 320 (5th Cir. 1999)). When a prosecutor vouches for government witnesses, it provides the witnesses with "the imprimatur of the Government, and may induce the jury to trust the Government's judgment rather than its own view of the evidence." Id. (quoting United States v. Young, 105 S. Ct. 1038, 1048 (1985)). However, the government may argue that the jury can or should infer from the relevant facts that a witness does not have a reason to lie. Gallardo-Trapero, 185 F.3d at 320. To determine whether to reverse a conviction based on a prosecutor's statements, this court reviews the statements in two steps. Id. First, it must determine whether the prosecutor made an improper remark. Id. If the remark was improper, it decides whether it substantially affected the defendant's right to a fair trial. Id.; Ramirez-Velasquez, 322 F.3d at 874 (quoting United States v. Murrah, 888 F.2d 24, 27 (5th Cir. 1989).

Because the defendants did not object to the prosecutor's above quoted comments about the Border Patrol agents' testimony, this court's review is for plain error only. United States v. Mares, 402 F.3d 511, 515 (5th Cir. 2005). Thus, defendants must establish that "(1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights." United States v. Gracia-Cantu, 302 F.3d 308, 310 (5th Cir. 2002).

In Gallardo-Trapero, a majority of a panel of this court agreed that a prosecutor improperly bolstered a Drug Enforcement Administration agent's

testimony. 185 F.3d at 320. In that case, the prosecutor stated to the jury in closing argument:

> "[D]o you think that agents for the federal government and a prosecutor for the federal government, for the United States of America, are going to risk their career and get on the stand and commit * * * would get on the witness stand and commit perjury and risk their career. It's not going to happen, ladies and gentlemen." Id. at 319.

A majority of the panel concluded that the remarks were improper because they "invoked the aegis of a governmental imprimatur." Id. at 320. However, the court found that the statements did not "prejudicially affect the substantive rights of the defendants," so it did not reverse the conviction. Id.

In Ramirez-Velasquez, 322 F.3d at 873-76, this court again addressed allegations that a prosecutor improperly commented on the credibility of government witnesses. In response to defense counsel's suggestion that the government was prosecuting the defendant despite the fact that it knew he was innocent, the prosecutor stated:

> "Do the agents have any reason? Do they have a reason to throw away their career, to say, oh this load is just too much for me, I'm going to give up my twenty-year law enforcement career, because I really care that two people get convicted. They're there to testify to the truth. They enforce the laws and they're going to honor it. And they're going to say, these are the facts.
> * * *
> I guess they want you to think that you we [sic] made this whole thing up, that Agent Perez after twenty years in law enforcement, seven years as a special agent with the Border Patrol working out of DEA just—" Id. at 873.

The court found that these statements were inappropriate, despite the fact that they were a response to the defense counsel's allegations, because the prosecutor "went too far in arguing that, as a rule, federal law enforcement agents appear in court and tell the truth." Id. at 875. However, it held that the statements did not affect the defendant's substantial rights, and so did not reverse. Id. at 876.

In this case, the prosecutor's statements concerning the agents' testimony do not warrant a reversal. The prosecutor asked the jury why the government agents "would . . . get up here and try to make up lies or make up suggestions," and reminded the jurors that the agents "were there," and were "telling you what they saw." He also told the jury three times that the case turned on whether the jury believed the agents' testimony. Unlike the remarks at issue in Gallardo-Trapero, the prosecutor's remarks did not imply that because they are government agents, the witnesses would not lie. They also do not imply that as a general rule, federal law enforcement agents tell the truth in court. See id. at 875. Thus, the prosecutor's remarks did not improperly "invoke[] the aegis of a governmental imprimatur." Gallardo-Trapero, 185 F.3d at 320. Instead, they accurately stated that whether the defendants should be convicted depended upon whether the jury believed the testimony of the Border Patrol agents. The prosecutor simply suggested that the jury should infer from the facts that the agents did not have a reason to lie. See id. That was not improper argument, and certainly not plainly improper argument.

Therefore, we hold that the prosecutor's statements did not improperly bolster the testimony of government witnesses, and that the district court did not err, and certainly did not plainly err, in failing to take sua sponte action in respect to that argument.

C. Minor Role Adjustment

Romeo-Ortiz is the only appellant who challenges his sentence. He argues that the district court erred by failing to apply a two-point downward adjustment to his offense level pursuant to U.S.S.G. § 3B1.2(b) because he was a "minor participant" in the drug trafficking enterprise in which he took part. Under section 3B1.2, a district court may decrease a defendant's offense level by two points if he is considered a minor participant. Under note 4 of section 3B1.2, a "minimal participant" is one who is plainly among the least culpable of those

21

involved in the conduct of a group. Note 5 indicates that a minor participant is "less culpable than most other participants," but his role is not minimal. A minor participant must be peripheral to the advancement of the criminal activity. United States v. Miranda, 248 F.3d 434, 446-47 (5th Cir. 2001).

Romeo-Ortiz did not object in the district court to the failure to reduce his base offense as a minor participant so the plain error rule applies. United States v. Washington, 480 F.3d 309, 313 (5th Cir. 2007). A person convicted of merely transporting drugs, a mere "mule," is not necessarily a minor participant in the illicit activity. United States v. Pofahl, 990 F.2d 1456, 1485 (5th Cir. 1993). Thus, the district court did not commit plain error by failing to give Romeo-Ortiz a minor role adjustment of two points despite the fact that he may have played only a small role in the drug trafficking activity in which he participated. United States v. Jenkins, 487 F.3d 279, 282 (5th Cir. 2007) (holding that a district court did not clearly err by failing to award a defendant a downward adjustment for being a mere drug courier because a courier is not necessarily a minor participant).[12]

## CONCLUSION

For the foregoing reasons, the respective convictions and sentences of each of the appellants are in all things

## AFFIRMED.

---

[12] When a defendant timely objects to a district court's failure to make a downward adjustment based on section 3B1.2, this court reviews his sentence for clear error. Jenkins, 487 F.3d at 282.