JAMES L. DENNIS, Circuit Judge,
dissenting:
I agree with the majority that the government committed multiple constitutional violations causing “clear or obvious” legal errors during Jose Julian Andaverde-Ti-ñoco’s criminal trial. I further agree with the majority that the government’s violations affected the outcome of Andaverde’s trial and, had the government not unlawfully urged the jury to convict Andaverde for impermissible reasons, the jury may not have done so. Unlike the majority, however, I do not agree that this court of law should tolerate a conviction that was obtained in an illegal manner and I would afford a new trial in which Andaverde’s guilt or innocence could be determined according to constitutional requisites. For the reasons that follow, I respectfully dissent.
I.
A.
After being spotted by Border Patrol in an empty field near the Texas-Mexico border, Andaverde and several others with him were apprehended. The arresting agents transported the detainees by motor vehicle to a nearby Border Patrol station. During the ride, one of Andaverde’s companions — but not Andaverde — reported that the group was “beaten and robbed” in Mexico, on the other side of the Rio Grande River. Once at the station, it was discovered that Andaverde had unlawfully entered the United States on prior occasions and had been deported. His companions were permitted to return to Mexico without further legal proceedings, but he remained detained. He was indicted and prosecuted for illegally reentering the United States following a prior deportation in violation of 8 U.S.C. § 1326. At trial, *527 Andaverde stipulated to all elements of the offense, admitting that he had in fact previously entered the United States unlawfully and been deported, but he maintained, pursuant to the defense of duress, that he was innocent of illegal reentry, contending that he did not enter into the United States under his own volition this time, but rather under threat of force. Testifying in his own defense, he told the jury that, while driving on a road in Mexico near the Rio Grande River, he and his companions were robbed at gunpoint. The robbers, he testified, took their car and money and ordered them to swim across the river, threatening to start firing if they did not. Andaverde and his companions followed the orders and swam across the river while the robbers escaped with their property. Some time after reaching the other side and entering the United States, the group was found and arrested in the field. Because Andaverde stipulated to all elements of the illegal reentry offense, the only issue for the jury to decide was whether to believe his story about entering the United States under duress. If the jury believed Andaverde’s story, it would have to acquit. If the jury did not, it would have to convict.
B.
As the majority explains persuasively, the government committed multiple violations of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), during the course of Andaverde’s short trial. The Doyle rule is simple and should be understood by all prosecutors: once the government, acting through an arresting officer, informs an arrestee that he has the right to remain silent — see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) — the government may not then at the criminal trial argue to the jury that the defendant’s post-arrest silence is suspicious and good reason to disbelieve the story he offers at trial but did not tell the arresting officers. Doyle, 426 U.S. at 619-20, 96 S.Ct. 2240. “Because it is fundamentally unfair simultaneously to afford a suspect a constitutional right to silence following arrest and yet allow the implications of that silence to be used against him, prosecutorial comment on silence for either substantive or impeachment value is constitutionally prohibited.” United States v. Shaw, 701 F.2d 367, 381 (5th Cir.1983) (internal quotation marks omitted); see also United States v. Harp, 536 F.2d 601, 603 (5th Cir.1976) (“[I]t is fundamentally unfair to allow an arrested person’s silence following Miranda warnings to be used to impeach an explanation subsequently offered at trial.”).
But that is what happened here. In flagrant disregard of Doyle’s clear and longstanding command, the government argued to the jury again and again that Andaverde’s story about being robbed in Mexico and forced to cross the river at gunpoint should be disbelieved because he failed to announce it immediately after he was arrested, instead exercising his right to remain silent. In essence, the government urged the jury to convict Andaverde for exercising a constitutional right, and that unlawful strategy deprived him of the due process the Constitution requires. See Wainwright v. Greenfield, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (“Doyle and subsequent cases have thus made clear that breaching the implied assurance of the Miranda warnings is an affront to the fundamental fairness that the Due Process Clause requires.”).
As explained by the majority, the government’s unlawful trial strategy began during Andaverde’s testimony in his defense in which he explained how he, allegedly, entered into the United States under duress, was found in the empty field, and *528 was read his Miranda rights then, at the time of arrest.[1] On cross-examination, the government elicited from Andaverde two admissions that, after being arrested and read his Miranda rights, he remained silent at that time and during the ride to the station:
Q: At no point did you ever tell any of the agents that you had been robbed on the other side, did you, up until the point that you were at the Border Patrol station like you’re saying?
A: That’s right, until I was at the Immigration office.
To make sure the jury did not miss the government’s point, the prosecutor asked for more:
Q: And when they found you in the field, you didn’t go running to them at all saying, “Oh help. I need your help. Someone on the other side wants to get me,” did you?
A: No.
And with that, the government had found its theme for the remainder of the trial. During the government’s closing statement, the prosecutor hammered on the point repeatedly. First:
When they saw the lights of the Border Patrol vehicles, they laid down and hid. They didn’t run up to them and say, “Thank God you’re here. We needed some help. We got robbed.” No, they hid. When the agents shined their flashlights on them, they ran.
So what did the defendant do after he actually got caught here and put in the Border Patrol vehicle? He starts joking with the agent.[2] He doesn’t say anything about the alleged robbery.
(Emphasis added.) Second:
One of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of a robbery. Didn’t say when or where really, but he made a claim. The defendant was right there. He said nothing.
(Emphasis added.) Third:
He gets back to the station.... He’s given the opportunity later to say anything else he wanted to say and make a claim of any — that he was a victim of some sort of violence. He said nothing.
(Emphasis added). And, fourth:
At least one of the other aliens did. They took the opportunity to make the claim again at the station.... The defendant didn’t even make the claim.
(Emphasis added.)[3] After the government finished, Andaverde’s attorney gave *529 the defense’s closing statement. Then, the government provided a brief rebuttal in which the prosecutor-again-returned to the silence. Fifth:
Two Border Patrol agents were dispatched out to the scene, and when they were dispatched out to the scene, the defendant hid. They arrested him. They put him in the back of their vehicle, and he never once said anything to them about being forced. That was another person. It was another person who’s not on trial here today.
(Emphasis added). Once that summary was over, the trial concluded and the jury’s deliberations began.
C.
The deliberations were close. A little over two hours in, the jury reported that it was evenly deadlocked, six jurors wanting to convict and six wanting to acquit. The court urged the jury to continue working to reach unanimity, and a short time later, the jury did. It rejected Andaverde’s duress defense and found him guilty.
II.
Despite the repeated and obvious nature of the government’s Doyle violations, An-daverde’s attorneys did not object at trial to any of them. Consequently, this court reviews for plain error. See Fed.R.CkimP. 52(b). Under such review, we will reverse a conviction only for legal error that is “clear or obvious” (in other words, “plain”) and affected the outcome of the district court proceedings (or put another way, affected the defendant’s “substantial rights”). United States v. Olano, 507 U.S. 725, 732-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United States v. Escalante-Reyes, 689 F.3d 415, 419 (5th Cir.2012) (en banc).
If those requirements are met, this court “has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.” Escalante-Reyes, 689 F.3d at 419 (alteration omitted). Our discretion to remedy plain error “should be employed in those circumstances in which a miscarriage of justice would otherwise result.” Olano, 507 U.S. at 736, 113 S.Ct. 1770 (internal quotation marks omitted); see also Escalante-Reyes, 689 F.3d at 425 (stating that, although “we do not view the fourth prong as automatic if the other three prongs are met,” we “should,” however, correct errors “in those circumstances in which a miscarriage of justice would otherwise result”) (internal quotation marks omitted).
Here, the majority holds that the Doyle errors in this case were plain and affected the outcome of the trial, and I agree. The remaining question is whether we ought to exercise our discretion to remedy the errors. I think we ought to.
A.
The majority states that there is no “exact test” for determining how this court should exercise its discretion. Ante, at 523. That is undoubtedly true. But it is also true that our case law provides ample guidance, and for the reasons that follow, fealty to our prior decisions demands that we provide a new trial. See Martin v. Franklin Capital Corp., 546 U.S. 132, 139, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005) *530 (“Discretion is not whim,” and “like cases should be decided alike.”).
Although a number of factors may affect the court’s decision on whether to remedy plain error, a core determinant is the severity of the error. See Escalante-Reyes, 689 F.3d at 423 (“The focus of plain error review should be whether the severity of the error’s harm demands reversal....”) (internal quotation marks and alterations omitted); see also id. at 440 n. 25 (Smith, J., dissenting) (“[T]he degree to which the second and third prongs have been met [may] influence[ ] a fourth-prong analysis. There may be a case in which, for example, an error that is particularly obvious to the district judge and affects substantial rights to a great degree is thereby likely to meet the fourth prong.”).[4] And, the Doyle violations here were severe for several reasons.
First, there is the obviousness of the violations. Doyle prohibits the government from asking the jury to infer guilt directly from post-arrest silence, and that is precisely what the government did repeatedly in an open and obvious manner. There was nothing subtle about what the prosecutor was suggesting to the jury when he said, for example, that, “[o]ne of the other aliens that was in the vehicle, he took the opportunity to make some sort of claim of robbery,” but “[t]he defendant was right there” and “[h]e said nothing.” (Emphasis added.) This is not an instance where reasonable minds could differ on the government’s intended meaning. The prosecutor here employed textbook Doyle violations to win a conviction. With less egregious Doyle violations, such as, for example, where the prosecutor merely mentions post-arrest silence in passing without pressing the matter, the court may have greater leeway to allow the conviction ió stand. But obvious violations of this sort demand a remedy. See United States v. Rodriguez, 260 F.3d 416, 422 (5th Cir.2001) (explaining that, when the prosecution “directly links” the defendant’s post-arrest silence to the implausibility of his exculpatory story offered at trial, the government commits the most egregious sort of Doyle violation) (citing Chapman v. United States, 547 F.2d 1240, 1249-50) (5th Cir.1977).
Second, there is the pervasiveness of the violations. Not only did the government violate Doyle in an open and obvious manner, but it did so repeatedly. The Doyle violations began during Andaverde’s cross-examination and they continued throughout closing statements and rebuttal. This pervasiveness affects the severity of the error and itself favors correction. Compare United States v. Carter, 953 F.2d 1449, 1467 (5th Cir.1992) (declining to reverse for Doyle violation under plain-error review where “the prosecutor mentioned [the defendant’s immediate post-arrest silence] only once very briefly in passing ... and never emphasized it”), with United States v. Meneses-Davila, 580 F.2d 888, 895 (5th Cir.1978) (reversing for Doyle violations under plain-error review where “[t]here was more than a single reference to defendant’s silence” and “[t]he repetition ensured that the prosecutor’s point could not have been lost on the jury, for the trial lasted just one day”).
Third, because of the unique circumstances of this case, the Doyle violations affected Andaverde’s substantial rights to a great degree. The sole issue before the jury was whether to believe the story underlying Andaverde’s duress defense, that he was robbed and forced to enter the *531 United States against his will. Andaverde stipulated to the elements of the illegal reentry offense and he presented no affirmative defenses beside duress. Thus, the government’s impermissible Doyle impeachment undercut the only issue for decision, whether Andaverde’s story should be believed. That incredibly close nexus between the government’s violations and the purpose of the trial both goes to the severity of the error and is itself cause for granting a new trial. Compare Carter, 953 F.2d at 1465 (declining to reverse for Doyle violations under plain-error review because, inter alia, “the story being impeached here is essentially peripheral to [the defendant’s] defense”), with United States v. Johnson, 558 F.2d 1225, 1230 (5th Cir.1977) (reversing for Doyle violations under plain-error review where the violations “went to the heart of the sole defense, encouraging the jury to believe that the defense was fabricated after arrest”), and United States v. Harp, 536 F.2d 601, 603 (5th Cir.1976) (reversing for Doyle violations under plain-error review where “the prosecutor’s comments struck at the jugular of the story”).
If there is any doubt that the government’s repeated Doyle violations were effective in hurting Andaverde’s case, as they were intended to, that doubt should be dispelled by the fact that the jury deliberated for hours before reporting it was evenly deadlocked with six jurors wanting to convict and six wanting to acquit. See United States v. Morales, 854 F.2d 61, 64-65 (5th Cir.1988) (Smith, J., dissenting) (contending that Doyle violations warranted reversal under plain-error review because the record showed the jurors having difficulty reaching unanimity).
The government’s repeated Doyle violations in this case were obvious. The violations pervaded the short trial. And, the record shows that the jury was in all probability influenced by the government’s unlawful and impermissible argument. The record shows, in short, that the government’s Doyle violations were severe. We should not allow convictions obtained through such illegal means to stand. Under our precedent, such severe Doyle violations warrant a new trial even though the defendant’s attorneys failed to lodge objections at the proper time. See Meneses-Davila, 580 F.2d at 895; Johnson, 558 F.2d at 1230; Harp, 536 F.2d at 603.
B.
The majority contends that four of our cases are “instructive” in illustrating why we should allow this unlawfully-obtained conviction to stand. See ante, at 523-24 (discussing United States v. McCann, 613 F.3d 486, 503 (5th Cir.2010), Escalante-Reyes, 689 F.3d at 425-26, United States v. Reyna, 358 F.3d 344, 352-53 (5th Cir.2004) (en banc), and United States v. Seale, 600 F.3d 473, 490 (5th Cir.2010)).
Three of those cases — McCann, Esca-lante-Reyes, and Reyna — involve legal errors that occurred at sentencing and were caused by the district court’s procedures. See McCann, 613 F.3d at 502 (court did not consider necessary documents in calculating sentence); Escalante-Reyes, 689 F.3d at 425-26 (court based sentence on impermissible consideration); Reyna, 358 F.3d at 352-53 (court did not allow defendant to speak during sentencing). It is not apparent — and the majority offers no affirmative explanation — what import those sentencing cases have here, where the government obtained a conviction from the jury through repeated, unlawful Doyle impeachment. I see no reason McCann, Es-calante-Reyes, or Reyna require or even suggest that this court should sit on its hands here.
Scale — the fourth case relied on by the majority — far from supporting the majori *532 ty’s decision to allow the unlawfully obtained conviction here to stand rather illustrates why we should require a new trial. Seale, like this case, involved the right of an arrestee to remain silent. The defendant there was arrested for murder at his home and transported by motor vehicle to the police station. During the ride, the arresting officers peppered the defendant with questions but they never read him his Miranda rights, viz., that he had the right to remain silent. One of the officers told the defendant: “We know you did it, you know you did it, the Lord above knows you did it.” That caused the defendant to respond, “Yes, but I’m not going to admit it, you are going to have to prove it.” At the later criminal trial, the government presented the defendant’s statement to the jury as evidence of his guilt. That was plain legal error, we held: because the arresting agents did not inform the defendant of his Miranda rights, the statement obtained from him during interrogation while he was in custody should have been excluded from evidence as inadmissible. However, we declined to use our discretion to remedy the error because we concluded that the erroneous admission of the statement “did not result in a manifest miscarriage of justice,” explaining that, “we are satisfied that the Government presented a strong case of guilt. While the defendant’s statement may have been helpful to the Government, it was certainly not the centerpiece of its case.” 600 F.3d at 490 (emphasis added).
This case stands in stark contrast. Here, the government’s unlawful Doyle impeachment was in fact the centerpiece of the government’s case. The government’s closing statements that pound on Andav-erde’s silence five times can be read no other way. The prosecutor told the jury that, when Andaverde was arrested and taken to the border patrol station by motor vehicle, during the ride, “[h]e d[id]n’t say anything about the alleged robbery.” To further highlight his silence, the prosecutor then told the jury that one of the other persons arrested with Andaverde told the story of the group’s innocence, but Andaverde did not: “[He] was right there. He said nothing.” Next, the prosecutor turned to after the ride, when Andaverde and the others arrived at the station. There, once again: “He said nothing.” And, again: “At least one of the other aliens” “took the opportunity to make the claim again at the station.” But not the defendant: “The defendant didn’t even make the claim.” In summing up the case for the jury, the prosecutor zeroed in on the silence one last time: “[H]e never once said anything to them about being forced. That was another person. It was another person who’s not on trial here today.” No reasonable juror could have listened to these five references to Andaverde’s post-arrest silence and thought the issue was anything but the centerpiece of the government’s case. As already discussed, the sole issue for trial was whether Andav-erde’s story of entry into the United States under duress should be believed, and the government presented precious little evidence besides the impermissible Doyle impeachment on that issue.
In sum, Seale suggests that Andaverde should be afforded a new trial. Although this court declined to remedy the government’s legal violations in Seale because the violations played a minor role in the trial as a whole and were “certainly not the centerpiece of [the government’s] case,” here, the government’s violations permeated the trial and were in fact the centerpiece of the government’s case. The majority has identified no case — and I believe there is none — in which this court (or indeed, any other) has tolerated such unlawfulness underlying a conviction.
*533 C.
Those four cases aside, the majority provides an additional reason for declining to correct the plain errors here: because An-daverde’s counsel bears some of the fault for the trial’s focus on his post-arrest silence. As the majority explains, the defense attorney’s opening statements to the jury included the ambiguous statement that “they ” — referring to Andaverde and the others with whom he was arrested— explained “their” duress story to the arresting agents, thereby arguably creating the false impression that Andaverde himself, as one of the persons included in the plural “they,” had personally told the story at the time of his arrest. That ambiguous statement, the majority contends, “opened the door” for the government to clarify that, contra the misleading implication of Andaverde’s attorney’s opening statement, the defendant had actually not told his story at the time of arrest, but rather remained silent. See generally Rodriguez, 260 F.3d at 421 (explaining that, “when a defendant testifies at trial that he told his exculpatory story at the time of his arrest,” then “the defendant’s silence is admissible only for the limited purpose of rebutting the impression that the accused had actively cooperated with the police”). After that was clarified, however, the government did not stop. Instead, it repeatedly ran afoul of Doyle, hammering on the post-arrest silence again and again, calling on the jury to find Andaverde guilty because of the silence. The majority is correct that Andaverde’s attorney bears the fault for initially “opening the door” to limited discussion of whether An-daverde had professed his innocence immediately at the time of arrest, as the attorney’s opening statements arguably implied, or only later, at the station, as Andaverde clarified in his testimony. That, however, does not make the government’s subsequent, repeated Doyle violations, in which the government went far beyond the permissible limit, any less egregious. See id. (explaining that, when the defendant “opens the door” to allow post-arrest silence to be used for a “limited purpose,” the government remains prohibited from going further and arguing that “the defendant’s silence was inconsistent with his claim of innocence”); United States v. Martinez-Larraga, 517 F.3d 258, 268 (5th Cir.2008) (“We, and other circuits, have continued to recognize this ‘open the door’ or ‘reply’ exception to Doyle, while likewise recognizing that it does not permit the prosecution to argue that the jury should infer the defendant’s guilt directly from his post arrest silence.”) (citations, internal quotation marks, and alterations omitted). And, under our precedent, it does not support the majority’s decision to decline relief here.
In United States v. Meneses-Davila, this court addressed similar circumstances and concluded that, despite the defendant’s attorney’s conduct, we should afford a remedy. There, “the prosecutor made four separate, intentional references to defendant’s post-arrest silence,” and, “[i]n an apparent effort to reduce the impact of these comments by explaining that the defendant remained silent because he was advised he had a right to do so, defense counsel himself made three references to defendant’s silence.” 580 F.2d at 891. The defendant’s trial attorney, apparently unaware of the Doyle rule, did not object to any of the government’s comments and himself injected the defendant’s silence into the case. On appeal, this court held that, because the government’s repeated Doyle violations were severe and “[t]he repetition ensured that the prosecutor’s point could not have been lost on the jury, for the trial lasted just one day,” reversal was mandated. Id. at 895-96. We noted that some of the government’s comments *534 on the defendant’s silence were arguably “defense invited” but we disclaimed that as a reason for allowing the conviction to stand, explaining that the government went beyond its permissible bounds, requiring us to remedy the violations. Id. (“Even discounting the comments that might be claimed to be defense invited, however, the prosecutor’s other references mandate reversal.”).
Meneses-Davila, in short, stands for the principle that, where there are severe, repeated Doyle violations, as there were here, we should remedy the violations, even if the defendant’s attorney bears some culpability for the attention on his post-arrest silence. Andaverde’s attorney’s unfortunate performance did not give the government carte blanche to ignore the Constitution, as Meneses-Davila makes plain.
III.
Although the majority elects to let An-daverde’s unlawfully obtained conviction stand, it expresses ever so slight discomfort with the prosecutor’s tactics in this case. The majority warns, this court still “endorse[s] Doyle as strongly” as it ever has (as if we have any choice whether to “endorse” Supreme Court precedent), and this case, even though it results in a win for the government, somehow “highlights the risks for the prosecution if it chooses to comment on a defendant’s silence after Miranda warnings.” Ante, at 524 & n. 3.
Today is not the first time this court has adopted the role of the scold when it comes to the government disregarding Doyle. When we were faced with Doyle violations several decades ago, we took that opportunity to say, “we note that comment upon silence of the accused is a crooked knife and one likely to turn in the prosecutor’s hand” and “[w]e suggest that it be abandoned as a prosecutorial technique.” United States v. Edwards, 576 F.2d 1152, 1155 (5th Cir.1978). But we went further then — we concluded that, because the government had abused the trial process, the defendant’s conviction could not stand and the defendant deserved a new, lawful trial. Id. We were then, and we are today, a court of law tasked with enforcing constitutional rights and when faced with convictions obtained through plain violations of the Constitution, we must carry out our duty. Although the legal landscape has evolved in the past decades, no decision of the Supreme Court’s or ours since has instructed us to remain passive when faced with convictions obtained through the government’s obvious, severe, and pervasive violations of constitutional right. By choosing to do so here, the majority brushes aside our precedent demanding otherwise and disregards the “basic principle of justice” that “[discretion is not whim” and “like cases should be decided alike.” See Martin, 546 U.S. at 139, 126 S.Ct. 704.
In order to convince the jury of Andav-erde’s guilt, the government adopted an illegal trial strategy of impeaching him for exercising his right to remain silent, and the strategy worked: the jury found An-daverde’s exercise of his constitutional right suspicious, and he now remains in prison today. The government’s conduct was “an affront to the fundamental fairness that the Due Process Clause requires.” Wainwright, 474 U.S. at 291, 106 S.Ct. 634. We should require a new trial in which the jury can decide Andaverde’s guilt or innocence free from undue and unconstitutional Doyle influence.
I respectfully dissent.

.The government attempts to challenge in this appeal the fact that Andaverde was read his Miranda rights at the time he was arrested, but as the majority explains persuasively, the government's arguments must fail. The government itself elicited from Andaverde on cross-examination the fact that he was read his rights in the field — at the time of arrest- and the government never attempted at trial to show anything otherwise. The government cannot now disclaim the evidence it presented at trial merely because it is displeased with the consequences of that evidence.

. Despite this statement about Andaverde "joking” with the agent during the ride, there was no evidence of such presented at trial. We have no indication why the prosecutor told the jury that Andaverde was "joking” during the ride.

. Andaverde does not contend in this appeal that the two references to his silence at the station (as opposed to during the ride to the station) constituted independent Doyle violations. Regardless, they are relevant context to show the extent to which the government hammered on the entirety of the defendant’s post-arrest silence, elevating it to the primary *529 factor for the jury's consideration. Additionally, it bears mention that Andaverde testified that he did, contra the government's closing statement argument, explain his duress story at the station.

. This is not to imply that plain errors should be corrected only in those cases in which the errors were particularly "severe.” Depending on the context, a number of factors other than severity of the error may be relevant.